UNITED STATES of America,
Plaintiff–Appellee,

v.

Allan ROSS, Defendant–Appellant.

No. 92–2788.

United States Court of Appeals,
Eleventh Circuit.

Oct. 11, 1994.

Robert L. Sheketoff, Kimberly Homan, Sheketoff & Homan, James W. Lawson, Oteri, Weinberg & Lawson, Boston, MA, for appellant.

Alan Burrow, David L. McGee, Asst. U.S. Attys., Tallahassee, FL, for appellee.

Before EDMONDSON and BLACK, Circuit Judges, and JOHNSON, Senior Circuit Judge.

JOHNSON, Senior Circuit Judge:

Allan Ross ("Appellant") appeals his convictions arising out of a vast, multi-party, international conspiracy to distribute cocaine. Upon review, we affirm the convictions.

## I. STATEMENT OF THE CASE

### A. *Factual Background*

This case concerns an international marijuana and cocaine conspiracy spanning from 1976 to 1990, involving two major international drug organizations, the "West End Gang" headed by Appellant and a Colombian drug organization headed by Angel Sanchez. The West End Gang, headquartered in Montreal, Canada, was led by Dooney Ryan until his murder on November 14, 1984. Shortly after the murder, Appellant, having observed police at the motel where Ryan was staying and, being unaware of Ryan's demise, had his attorney, Sidney Leithman, call the Montreal Police Department to determine if Ryan and his companion that evening, Paul April, had been arrested. April became a suspect in Ryan's murder as Leithman's phone call alerted the police to April's presence with Ryan. On November 25, 1984, April was killed by a bomb in Montreal. Appellant thereafter indicated to two associates, Gaeton Lafond, Jr., and John Quitoni, that he had ordered April's murder in retaliation for the murder of Ryan. Appellant succeeded Ryan as the leader of the West End Gang.

At the time of Ryan's murder, he and Quitoni had been negotiating a cocaine deal, which Appellant subsequently consummated. Through Quitoni and James Allardyce, the West End Gang completed several deliveries of cocaine from South Florida to Canada. In May 1985, at the Marriott Harbor Beach Hotel in Ft. Lauderdale, Florida, Allardyce met with Appellant, Elaine Cohen (Appel-

lant's wife), David Singer, and Jean Guy Trepanier.[1]

Quitoni testified that within a week after this meeting, Trepanier asked him to come to the Windjammer Resort in Lauderdale-by-the-Sea to supply him a pistol. Quitoni gave the pistol to Trepanier and Raymond Des-Fosse, who was also present. Early the next morning, in an agitated state, Trepanier called Quitoni and asked him to come to the Windjammer to assist him. There, Trepanier and DesFosse told Quitoni that they had killed "the rat," David Singer, on behalf of Appellant because Singer was a potential witness against Appellant on drug and murder charges. They further admitted shooting a police officer the previous night, whereupon Quitoni drove Trepanier and DesFosse to an airport. Appellant later thanked Quitoni for aiding the escape of Trepanier and DesFosse.[2]

Shortly after midnight on May 10, 1985, Trooper Michael Foti of the Florida Highway Patrol stopped a maroon Toyota. As Foti approached the driver's side door, the driver fired a shot, wounding Foti in his right leg. Later that morning, a K–9 officer with the Ft. Lauderdale Police Department tracked two individuals who had fled from a maroon Toyota to the area where a witness had been assaulted shortly after the shooting of Foti. That witness identified Trepanier as the man who aimed a pistol at him while running down the street with another man; the police found the revolver used to kill Singer in the maroon Toyota. Singer's body was found the next day, and the medical examiner determined that Singer's death had occurred on May 10. An associate of Singer testified that shortly before Singer's death, he overheard Singer's side of a telephone conversation in which Singer was upset because Leithman was claiming that Singer was a police informant.

Meanwhile, Angel Sanchez ran a large drug operation in Colombia. Although initially the organization only smuggled marijuana into the United States, in late 1981, Angel Sanchez, Pompo Sanchez, William Blackledge, Mark Klein, Robert Lazara, and Robert Moore met to discuss Sanchez's first load of cocaine. Sanchez's organization flew in its first cocaine load in February 1982. Roberto and Raul Aspuru stored the imported cocaine in Florida prior to its distribution.

David Sabio, who was highly involved in the importations, testified that he arranged a 1986 meeting between Blackledge and Appellant to enable Sanchez to supply cocaine to Appellant. Blackledge thereafter introduced Moore to Appellant. According to Moore, Appellant agreed to make huge, biweekly purchases of cocaine. Roberto Aspuru testified that the Sanchez organization supplied Appellant approximately 300–400 kilograms of cocaine during this time. In 1987, Appellant met with Sanchez to discuss the delivery of a large cocaine shipment to Canada.

In the Spring of 1987, the Sanchez organization recruited Bertram Gordon to arrange a deal with Appellant. Gordon met with Appellant at Blackledge's home several times in 1987, and eventually they agreed that Appellant would import three loads of cocaine from Colombia to Canada, through the United States. The loads, each consisting of approximately 600 kilograms of cocaine, were flown from Colombia to Appellant's employees in Nashville, Tennessee. In July 1987, Gordon left the United States for Canada, where he served as a middleman in certain of Appellant's drug transactions.

That summer, Angel Sanchez sent two boats to Europe, the "Finesse" containing 146 kilograms of cocaine and the "Big John" containing 600 kilograms of cocaine. Working for Appellant, Trepanier was to off-load the "Finesse" cocaine and distribute it in Europe. Of the "Big John" load, although some was targeted for the Sicilian Mafia, the majority was scheduled for distribution in Spain by Appellant. Appellant sent other employees to assist Trepanier; however,

---

1. Records from the Marriott Hotel showed that Appellant, Cohen, Leithman, and Trepanier stayed there from late April 1985 through early May 1985.

2. Registration records at the Windjammer confirmed Trepanier's stay there from April 27, 1985 through May 8, 1985, and Trepanier's car rental contract for that period indicated that a "Cohen" residing at the Marriott Harbor Beach Hotel had referred him to the rental agency.

Portuguese and Spanish authorities made arrests and seized the "Finesse" cocaine.[3]

Contemporaneous with the ships' sailing, the Spanish National Police were observing Appellant's agents, Sabio and Francois LeBoeuf. The Spanish National Police wiretapped various telephones in accordance with Spanish law and observed Trepanier meeting with Appellant at the Malaga, Spain airport in late January 1988. The Spanish police then, again pursuant to Spanish law, wiretapped Appellant's hotel telephone. Transcripts of these various wiretaps were presented at trial, showing incriminating conversations between Sabio, LeBoeuf, Appellant, Blackledge, and Angel Sanchez and his associates. Simultaneously, the Spanish police in Madrid observed meetings between Angel Sanchez and members of Appellant's organization, including LeBoeuf and Sabio.

At trial, the government presented evidence of Appellant's attempts to intervene in the police investigation of the drug conspiracy. Specifically, John Flanders, a law clerk to Ft. Lauderdale attorney Kenneth DeLegal, testified that he flew to Montreal in late 1990 to consult with Leithman about the possible representation of Gordon. Although Leithman never told Flanders who was paying for this assistance, Flanders did see Appellant in Leithman's office. At Leithman's request, Flanders flew to Holland in January 1991 to offer Gordon representation, although DeLegal had no prior contact with Gordon. Gordon testified that (1) Flanders claimed to be an attorney retained by "his friends" to represent him, (2) Flanders advised him not to talk to any law enforcement authorities, and (3) Flanders claimed Appellant would provide him money.

Detective Chris Dale of the Broward County Sheriff's Department arrested Appellant on October 7, 1991 in Ft. Lauderdale. En route to jail, Appellant offered Dale a bribe, stating, as paraphrased by Dale: "Not that I would, but it sure would be nice if I could give you $200,000 or so and you would let me go." Dale ignored the comment.

### B. *Procedural History*

On February 14, 1990, a grand jury sitting in the Northern District of Florida returned a three-count superseding indictment against Appellant, charging him, along with two others in Count I, with engaging in a continuing criminal enterprise, in violation of 21 U.S.C.A. § 848 (West Supp.1994), and, along with fourteen others in Counts II and III, with conspiracy to import, to distribute, and to possess with intent to distribute marijuana and cocaine, in violation of 21 U.S.C.A. §§ 841, 846, 952 & 963 (West 1981 & 1994 Supp.). Upon the government's pretrial motion, the district court disqualified Appellant's chosen counsel from representing him at trial. The court also denied Appellant's motions to exclude certain government evidence concerning (1) the bombing in Montreal, the murder of Singer, and the shooting of the Florida state trooper, (2) foreign business records, and (3) transcripts of conversations intercepted in Spain by the Spanish National Police. The court granted, over Appellant's objection, the government's motion to empanel an anonymous jury, which was selected on April 7, 1992. The court held a jury trial from April 9, 1992 through May 13, 1992, when the jury returned a verdict of guilty on all three counts. In July 1992, the court sentenced Appellant to three concurrent life sentences, to pay a fine of ten million dollars, and to pay the cost of confinement and supervision.

Appellant, who is currently incarcerated, filed a timely notice of appeal on August 13, 1992. Appellant raises the following issues on appeal: (1) whether the court erred in admitting into evidence transcripts of tape recordings of telephone conversations intercepted by the Spanish National Police; (2) whether 18 U.S.C.A. § 3505 (West 1985) is constitutional; (3) whether the court abused its discretion by limiting Appellant's recross-examination; (4) whether the court abused its discretion by empaneling an anonymous jury; (5) whether the court abused its discretion by disqualifying Appellant's choice of counsel; (6) whether the court abused its discretion by admitting evidence of Appel-

---

**3.** After the seizure of the "Finesse" cocaine, Sabio and Gordon fled Spain for Holland, where

Gordon was arrested by Dutch law enforcement authorities on February 13, 1989.

lant's violent acts; and (7) whether the court erred by refusing to deviate from pattern jury instructions.[4] Upon review, all of Appellant's claims fail.

## II. ANALYSIS

### A. *Admission of Transcripts*

██ When Appellant was in Spain, he met with several of his alleged coconspirators and arranged for the importation and distribution of cocaine. In investigating Appellant, the Spanish National Police installed court-ordered wiretaps on telephones used by Appellant and certain of his coconspirators. Some of the recorded conversations were in English, others in Spanish. The Spanish National Police made transcripts of the recordings, which were then destroyed in the ordinary course of business.[5] Over objection, the district court permitted the government to introduce English-language transcripts of thirteen intercepted and recorded conversations without producing the underlying tape recordings.[6]

██ Appellant contends that (1) the court abused its discretion (a) in admitting the transcripts pursuant to Federal Rule of Evidence 1004 and (b) in admitting them apart from the procedures set out in *United States v. Onori*, 535 F.2d 938 (5th Cir.1976) (quorum), and (2) the transcripts' admission violated the Due Process Clause of the Fifth Amendment to the United States Constitution.[7] We review the denial of a motion to suppress as a mixed question of law and fact. *United States v. Hooshmand*, 931 F.2d 725, 735 (11th Cir.1991). We review the district court's findings of fact for clear error and the application of the law to those facts *de novo*. *Id.* Moreover, the court's determinations of evidence's admissibility are not disturbed absent an abuse of discretion. *United States v. Cohen*, 888 F.2d 770, 774 (11th Cir.1989).

██ The absence of the audiotapes containing the original recorded statements is troublesome. Nonetheless, we differ with Appellant's contention that the court should have excluded the transcriptions of the telephone conversations that occurred in Spain on best evidence grounds. Federal Rule of Evidence 1002 provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided ... in these rules." The purpose of the best evidence rule is to prevent inaccuracy and fraud when attempting to prove the contents of a writing. FED.R.EVID. 1001 advisory committee's note. However, where the original of a recording has been lost or destroyed, the original is not required and other evidence of its content is admissible, unless the proponent lost or destroyed the original in bad faith. FED.R.EVID. 1004(1). Once the terms of Rule 1004 are satisfied, the party seeking to prove the contents of the recording—here, the government—may do so by any kind of secondary evidence. *See, e.g., United States v. Gerhart*, 538 F.2d 807, 809 (8th Cir.1976); JACK B. WEINSTEIN & MARGARET A. BERGER, 5 WEINSTEIN'S EVIDENCE § 1004[01], at 1004–4–1004–5 (1993). Finally, the party against whom the secondary evidence is being offered bears the burden of challenging its admissibility. *United*

---

**4.** Appellant's brief lists twelve issues. For the sake of clarity, our discussion consolidates his claims.

**5.** Only portions of the tape-recorded conversations, those deemed "important" or "interesting," were transcribed.

**6.** The transcripts were prepared through a process of transcription, translation, and, in the case of conversations conducted originally in English, re-translation.

The transcripts reflected the following 1988 conversations: (1) January 4, between Sabio and "a Colombian in Madrid," (2) January 5, between Sabio and an unknown person, (3) January 5, between Sabio and Angel Sanchez, (4) January 18, between Sabio and an unknown person, (5) January 20, summary of LeBoeuf conversation, (6) January 23, between LeBoeuf and Iberia Airlines, (7) January 25, between Gordon and unknown persons, (8) January 27, between Blackledge and Sabio, (9) January 30, between Appellant and Trepanier, (10) January 30, between Appellant and Blackledge, (11) January 30, between Appellant and Blackledge, (12) February 3, between Appellant and Blackledge, and (13) February 3, between Appellant and Blackledge.

**7.** "No person shall ... be deprived of life, liberty, or property, without due process of law". U.S. Const., amend. V.

*States v. Garmany,* 762 F.2d 929, 938 (11th Cir.1985), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 811, 88 L.Ed.2d 785 (1986).

■ Here, all of Rule 1004's requirements are met because the transcripts constituted "other evidence" of "the contents of ... recording[s]" that had been "lost or destroyed" through no fault of the government. *See* FED.R.EVID. 1004(1). First, the prosecution was not at fault for the absence of the cassette tapes, which the Spanish National Police destroyed as part of routine procedure.[8] Indeed, the prosecution never had any control of the tapes. Second, the transcripts constituted admissible best evidence because the transcripts were evidence of the contents of recordings, the misplaced or destroyed audiotapes. The two cases most directly on point—both involving transcripts of conversations recorded on audiotapes—support admission of the transcripts. In a negligence action, the Eighth Circuit held that where an original recording is missing, a transcript may be used to prove the content of the recording. *See Wright v. Farmers Co-op,* 681 F.2d 549, 553 (8th Cir.1982). In *United States v. Maxwell,* 383 F.2d 437 (2d Cir.

1967), *cert. denied,* 389 U.S. 1043, 88 S.Ct. 786, 19 L.Ed.2d 835 *and cert. denied,* 389 U.S. 1057, 88 S.Ct. 809, 19 L.Ed.2d 856 (1968), with facts comparable to those of this case, the Second Circuit upheld the use of a transcript as secondary evidence where the recording from which the transcript derived had been accidentally erased and the drafter of the transcript testified to its accuracy. 383 F.2d at 442–43.[9] Similarly, the transcripts here were admitted only after the original recordings could not be located due to standard procedures of the Spanish National Police, and the Spanish police officers who initially transcribed the recordings were cross-examined by Appellant's counsel. Moreover, we note that Appellant had ample opportunity to attack the transcripts' credibility before the jury. *See United States v. Howard,* 953 F.2d 610, 613 (11th Cir.1992) (per curiam) (suggesting that availability of monitoring agent at trial furthers purpose of best evidence rule to prevent fraud in proving contents of recordings because defendant may cross-examine agent's abilities and actions).[10] Accordingly, the court properly admitted the transcripts into evidence.

**8.** There is some dispute whether all the underlying tapes have in fact been destroyed. Spanish National Police officer Miguel Blanco testified that he prepared the Spanish transcripts that represent conversations intercepted over Sabio's telephone line onto a reel-to-reel tape and copied onto cassette tapes. According to Blanco, the master tape and the cassettes were destroyed pursuant to standard Spanish law enforcement procedure such that neither existed at the time of trial. Spanish National Police Officer Joaquin Manich testified that he prepared the Spanish transcripts that represent conversations intercepted over Appellant's telephone line. He transcribed portions of those conversations, which were transferred from a master reel-to-reel tape to cassettes. Manich testified that he believed the cassette tapes still existed pursuant to standard police procedure. Faced with this conflicting testimony, the court found that the cassette tapes were unavailable to the prosecution. We agree. *See Wright v. Farmers Co-op,* 681 F.2d 549, 553 (8th Cir.1982) (resolution of lost or destruction issues is reviewed for abuse of discretion).

**9.** The cases relied upon by Appellant are inapposite. In *United States v. Howard,* 953 F.2d 610 (11th Cir.1992) (per curiam), we held that the best evidence rule was inapplicable to testimony concerning the contents of a telephone conversation by the person who had monitored the tele-

phone conversation, when a partially inaudible tape recording of the conversation was also played for the jury. 953 F.2d at 612–13. Conversely, whereas the officer in *Howard* testified about the content of conversations that he had overheard, here the knowledge of the government's witnesses resulted exclusively from having listened to the recordings, not from personal observations of the conversations. Similarly, in *Onori,* we held that the trial court need not decide whether the transcript of a tape recording is accurate before that transcript is given to the jury to aid the jury's understanding of the recording, so long as, along with the recording, each party may submit its version of a transcript. 535 F.2d at 948. *Onori* does not apply to this case because the original recordings are unavailable.

Appellant also maintains, without authority, that, even if the best evidence rule applies, the transcripts should have been excluded as inadmissible hearsay. However, the court did not abuse its discretion by concluding that the statements in the transcripts were made by either Appellant or his alleged coconspirators and thus were admissible as, respectively, admissions or coconspirator statements. *See* FED.R.EVID. 801(d)(2)(A) & (E).

**10.** Appellant cites no supporting case law for his claim that the court denied due process by admitting the transcripts. We conclude that this

## B. *Admission of Foreign Records*

■ The government introduced into evidence certain foreign business records, pursuant to 18 U.S.C.A. § 3505.[11] Section 3505 allows the admission of foreign records of regularly conducted activity if supported by an affidavit meeting specifically delineated standards.[12] Appellant contends that section 3505 violates the Confrontation Clause of the Sixth Amendment.[13]

As part of the Comprehensive Crime Control Act of 1984, Congress designed the hearsay portion of section 3505 to track closely the business records exception to hearsay contained in Federal Rule of Evidence 803(6).[14] Subsection 3505(a)(1) "should be interpreted in the same manner as the comparable language in Rule 803(6) is interpret-ed." H.R.REP. No. 907, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3578, 3581. Congress intended to create "a simple, inexpensive substitute for the cumbersome and expensive procedures" formerly required for the admission of foreign records of regularly conducted activity. H.R.REP. No. 907, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.C.C.A.N. at 3182, 3580. Because the foreign records were created in foreign states where a United States district court's subpoena powers do not extend, *see* FED. R.CRIM.P. 17(e)(2), the statute establishes that the records' trustworthiness can be shown by an affidavit containing conditions analogous to those set out in Rule 803(6).[15]

The central issue is whether the use of an affidavit to authenticate foreign business records offends the Confrontation Clause. Al-

---

claim is without merit, particularly in light of Appellant's ability to cross-examine the government witnesses who testified about the contents of the tape.

**11.** These records included Aruban immigration records, Spanish and Italian hotel records, and Canadian passport applications, currency exchange records, car registration records, and phone tolls.

**12.** The statute provides in pertinent part:

> **§ 3505. Foreign records of regularly conducted activity**
>
> (a)(1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that—
> (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
> (B) such record was kept in the course of a regularly conducted business activity;
> (C) the business activity made such a record as a regular practice; and
> (D) if such record is not the original, such record is a duplicate of the original;
> unless the course of information or the method or circumstances of preparation indicate lack of trustworthiness.
> (2) A foreign certification under this section shall authenticate such record or duplicate.
>
> (c) As used in this section, the term—
> (1) "foreign record of regularly conducted activity" means a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, maintained in a foreign country;

> (2) "foreign certification" means a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country; and
> (3) "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**13.** "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him". U.S. Const., amend. VI.

**14.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

> (6) **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
> FED.R.EVID. 803(6).

**15.** *Compare* § 3505(a) *with* FED.R.EVID. 803(6).

though this Court has not yet had occasion to address this question, every federal court to consider the issue has held that section 3505 comports with the Confrontation Clause. *See United States v. Sturman,* 951 F.2d 1466, 1490 (6th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992); *United States v. Miller,* 830 F.2d 1073, 1077–78 (9th Cir.1987), *cert. denied,* 485 U.S. 1033, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988); *United States v. Gleave,* 786 F.Supp. 258, 276–280 (W.D.N.Y.1992); *United States v. Hing Shair Chan,* 680 F.Supp. 521, 522 (E.D.N.Y. 1988). *See also Chapman v. State,* 331 Md. 448, 628 A.2d 676, 678–86 (1993) (holding that out-of-court statements admitted under state statute permitting use of affidavit to establish status of bank account without requiring bank employee to testify bore sufficient guarantees of trustworthiness to satisfy requirements of federal Confrontation Clause, in part because federal courts have upheld the similar section 3505). We agree with those authorities and conclude that section 3505 is neither *per se* unconstitutional nor unconstitutionally applied in this case.

[9–11] The Sixth Amendment right to confrontation is not absolute. *United States v. Deeb,* 13 F.3d 1532, 1537 (11th Cir.1994) (citing *United States v. Chapman,* 866 F.2d 1326, 1330 (11th Cir.1989)). *See Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980) (noting that not all hearsay evidence is incongruous with Sixth Amendment). Even when the introduction of hearsay evidence denies a defendant the opportunity to confront a witness against him, the Confrontation Clause is satisfied if the prosecution establishes that (1) the hearsay declarant is unavailable, *id.* at 65, 100 S.Ct. at 2538–39,[16] and (2) the hearsay statement bears the "indicia of reliability" necessary to give the jury a sufficient basis for evaluating the verity of the earlier statement. *Id.* at 65–66, 100 S.Ct. at 2538–39. The Supreme Court has stated "that the 'indicia of reliability' requirement could be met in either of two circumstances: where the hearsay statement 'falls within a firmly rooted

hearsay exception,' or where it is supported by 'a showing of particularized guarantees of trustworthiness.'" *Idaho v. Wright,* 497 U.S. 805, 816, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990) (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539). "Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded long-standing judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Id.* at 817, 110 S.Ct. at 3147. However, where hearsay exceptions are admitted under an exception that is not firmly-rooted, they are presumptively unreliable and inadmissible for Confrontation Clause purposes and must be excluded absent particularized guarantees of trustworthiness. *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. These guarantees of trustworthiness must be such that the evidence is equally reliable as evidence admitted under a firmly rooted hearsay exception to ensure that confrontation through cross-examination would add little to its believability. *Wright,* 497 U.S. at 821, 110 S.Ct. at 3149–50 (citation omitted). *See United States v. Strickland,* 935 F.2d 822, 831 (7th Cir.) ("[Section] 3505 did not change the benchmark question in this and every situation involving the admission of documentary evidence: do the documents bear the indicia of reliability?"), *cert. denied,* — U.S. ——, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991), *and cert. denied,* — U.S. ——, 112 S.Ct. 884, 116 L.Ed.2d 787 (1992).

▪ The admission of business records pursuant to Rule 803(6) is a firmly-rooted exception to the hearsay rule and therefore does not violate the Confrontation Clause. *Bourjaily v. United States,* 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987). However, unlike Rule 803(6), section 3505 does not require the caretaker of the business records to appear in court and, thus, section 3505 does not qualify as a "firmly-rooted" hearsay exception. As the Supreme Court has noted, the codification of a hearsay exception does not alone qualify it

---

16. A witness is considered to be unavailable if, as is the case here, despite the government's good faith efforts, it is unable to procure that witness'

attendance at trial. *Id.,* 448 U.S. at 74, 100 S.Ct. at 2543.

for a presumption of reliability. *See Wright,* 497 U.S. at 817–18, 110 S.Ct. at 3147–48. If that were the case, then the Confrontation Clause protections would become increasingly ephemeral as Congress—and the individual legislatures of all fifty states—could effortlessly narrow the scope of the constitutional ban by legislative enactment. Therefore, our inquiry is whether section 3505 bears sufficient guarantees of trustworthiness to overcome the Sixth Amendment's constitutional hurdle to the admissibility of hearsay.

In concluding that the bank records in question in *Miller* bore sufficient indicia of reliability, the Ninth Circuit stated:

> The novelty of the statute is to admit the records without confrontation by the defendant with the recordkeepers. No motive is suggested that would lead bank officials to change, distort, or manipulate the records at issue here. The record-keepers have, under criminal penalties in their own countries, asserted that the records are records kept in the ordinary course of business. Examination of the recordkeepers by counsel for [the defendant] could not reasonably be expected to establish anything more or less than that. If the records were in fact inaccurate, it was within [the defendant's] power to de-

pose the recordkeepers and challenge the records.

830 F.2d at 1077–78. This reasoning applies with equal force under the facts of this case. Accordingly, we hold that, as applied in Appellant's case to admit foreign records kept in the ordinary course of business, section 3505 is constitutional.[17]

### C. *Limitation on Recross–Examination*

▆▆▆▆ The district court permitted Appellant to cross-examine all witnesses at great length; however, Appellant claims that the court committed reversible error by imposing an absolute ban on recross-examination,[18] particularly in regards to the denial of recross-examination of government witness David Herrera.[19] The defendant must be permitted sufficient cross-examination to allow a jury to adequately assess the witness' credibility; otherwise, any limitation on cross-examination was error. *United States v. Lankford,* 955 F.2d 1545, 1548 (11th Cir. 1992). Subject to the Sixth Amendment, the trial court has discretion to limit recross-examination. *See United States v. Beale,* 921 F.2d 1412, 1424 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 99, 116 L.Ed.2d 71, *and cert. denied,* —— U.S. ——, 112 S.Ct. 264, 116 L.Ed.2d 217 (1991).

---

17. Appellant contends, in the alternative, that the admission of the Aruban immigration records violated both the Confrontation Clause and section 3505 because they consisted of computer print-outs prepared for purposes of litigation. We reject this claim; the court did not abuse its broad discretion in admitting the Aruban records. *See* § 3505(c)(1) (defining foreign records of regularly conducted activity to include "data compilation, in any form"); *United States v. Hernandez,* 913 F.2d 1506, 1512–13 (10th Cir.1990) (holding that under Rule 803(6), "so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice, the fact that the hard copy offered as evidence was printed for purposes of litigation does not affect its admissibility."), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991).

Appellant further maintains that the court abused its discretion in admitting into evidence certain bank records in Gibraltar pertaining to accounts allegedly used to launder drug monies. These records were introduced through the testimony of a Portuguese police officer who, armed with search warrants, obtained them from the

Gibraltar bank. The contested documents served as additional corroboration of testimony of three government witnesses that many of Appellant's coconspirators had bank accounts at a particular bank. In light of the overwhelming evidence presented at Appellant's trial, we need not rule whether the admission of these bank records constituted an abuse of discretion, because, at worst, their admission was harmless error. *See United States v. Hawkins,* 905 F.2d 1489, 1493 (11th Cir.1990), *cert. denied,* 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991).

18. We note, initially, that the court did allow some redirect examination.

19. Two Spanish police officers testified that in late January 1988, they observed Appellant, Trepanier, Blackledge, Sabio, LeBoeuf, and Gordon dining together in southern Spain shortly after the arrival of the "Finesse" in Portugal. On redirect examination of Herrera, the government elicited, for the first time, testimony that Herrera had been present along with the Spanish police at the restaurant surveillance and that Herrera had only seen Ross and Trepanier.

As opposed to cross-examination, a defendant has no constitutional right to recross-examination. *United States v. Morris*, 485 F.2d 1385, 1387 (5th Cir.1973).[20] A defendant nonetheless does have a limited right to recross-examination where a new matter is brought out on redirect examination. *Id.* (citing *Hale v. United States*, 435 F.2d 737, 749–50 (5th Cir.1970), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971)). Indeed, as the Third Circuit recently held: "When material new matters are brought out on redirect examination, the Confrontation Clause of the Sixth Amendment *mandates* that the opposing party be given the right of recross-examination on those new matters." *United States v. Riggi*, 951 F.2d 1368, 1375 (3d Cir.1991) (emphasis added). *Accord United States v. Baker*, 10 F.3d 1374, 1404–05 (9th Cir.1993); *United States v. Caudle*, 606 F.2d 451, 457–58 (4th Cir.1979). The Confrontation Clause protects the defendant's *"opportunity* for effective cross-examination," *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam), and "is the principal means by which the believability of a witness" is tested. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). In other words, the absence of proper confrontation threatens the ultimate integrity of the fact-finding process. *Roberts*, 448 U.S. at 64, 100 S.Ct. at 2538. Thus, to allow redirect examination on new material but to deny recross-examination on the same material violates the Confrontation Clause. *See Caudle*, 606 F.2d at 458 ("Where, as here, new matter is brought out on redirect examination, the defendant's first opportunity to test the truthfulness, accuracy, and completeness of that testimony is on recross examination. To deny recross examination on matter first drawn out on redirect is to deny the defendant the right of any cross-examination as to that new matter.") (citations omitted). We therefore conclude that by denying Appellant an opportunity to recross-examine regarding new material elic-ited from Herrera on redirect, the court *a fortiori* abridged the Confrontation Clause.

However, this violation is subject to harmless error analysis. *Hawkins*, 905 F.2d at 1493. Reversal is not required if, assuming the damaging potential of recross-examination was fully realized, the error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). The factors we consider in determining harmlessness include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and ... the overall strength of the prosecution's case." *Id.* We hold, based on our analysis of these factors, that the error was harmless beyond a reasonable doubt. First, Appellant makes no showing that opportunity for further recross-examination of Herrera would have affected the outcome of the case given the overwhelming degree of evidence favoring the prosecution. In addition, the import of the new evidence brought out on the redirect examination of Herrera was, at best, minimal. Further, although the court denied Appellant the opportunity to recross-examine Herrera, the court in no way prevented Appellant from calling Herrera as his own witness and questioning him directly about his observations in Portugal. *See Hale*, 435 F.2d at 752 n. 22 (prevention of recross-examination "would not have prevented appellant from confronting his accusers; it would only have affected the order of confrontation. All the witnesses were equally available to the appellant and could have been called to the witness stand by him and questioned on direct examination as to any point he desired."). Accordingly, the court's decision to limit Appellant's recross-examination of Herrera was harmless error.[21]

---

**20.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**21.** From a broad reading of Appellant's briefs, we infer that he also disputes the court's precluding recross-examination of other witnesses. Any such complaint is without merit as Appellant has thereupon shown no prejudice whatsoever.

## D. Empanelment of Anonymous Jury

■ Upon the government's motion, the district court selected an anonymous jury for Appellant's trial. The court ordered that the juror's names, addresses, places of employment, and spouses' names and places of employment not be disclosed during voir dire or at any point thereafter.[22] As a further security measure, the court also ordered that the jurors, who were not sequestered, meet each morning in a central location to which federal marshals would return them at the close of the court day and that they remain in the custody of the marshals throughout the court day. The court's decision to empanel an anonymous jury was premised on its finding that (1) Appellant faced serious charges of dangerous conduct in the context of a large-scale criminal organization, (2) Appellant was able to harm and/or threaten jurors, (3) Appellant had previously attempted to interfere with the judicial process, and (4) harmful pretrial publicity had occurred. Appellant contends that the empanelment of an anonymous jury violated his right to the presumption of innocence under the Fifth Amendment and his right to trial by an impartial jury under the Sixth Amendment.[23] Moreover, Appellant asserts that the court's cautionary instruction failed to alleviate this allegedly unconstitutional effect. Under the circumstances of this case, we reject Appellant's claims.

Anonymous jury empanelment is an issue of first impression in this Circuit, but our analysis is guided by the methodology developed in other circuits. Every court that has considered the issue has held that, when genuinely needed and when properly used, anonymous juries do not infringe a defendant's constitutional rights. *See United States v. Paccione*, 949 F.2d 1183, 1191–93 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *United States v. Thomas*, 757 F.2d 1359, 1362–65 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985), *and cert. denied*, 479 U.S. 818, 107 S.Ct. 78, 93 L.Ed.2d 34 (1986). *Accord United States v. Crockett*, 979 F.2d 1204, 1215–17 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993); *United States v. Scarfo*, 850 F.2d 1015, 1021–26 (3d Cir.), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988).[24] *Cf. United States v. Varella*, 692 F.2d 1352, 1355 (11th Cir.1982) (upholding government's objections during testimony to disclosure of names, addresses, and occupations of two government witnesses), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1392 *and cert. denied*, 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983). Further, a lower court's decision to empanel an anonymous jury is entitled to deference and is subject to abuse of discretion review. *See Paccione*, 949 F.2d at 1192. *Accord United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993); *Crockett*, 979 F.2d at 1215–16. *See United States v. Daniels*, 986 F.2d 451, 454 (11th Cir.1993) (district court has wide discretion in determining which questions will be asked during voir dire).

■ Unquestionably, the empanelment of an anonymous jury is a drastic measure, one which should be undertaken only in limited and carefully delineated circumstances. An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence. The presumption of innocence is "undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895). *See Estelle v. Williams*, 425 U.S.

---

**22.** In the usual case, the parties know the names, addresses, and occupations of potential jurors, as well as those of any spouses, and use this information during voir dire to formulate questions probing for potential biases, prejudices, or any other considerations that might prevent a juror from rendering a fair and impartial decision.

**23.** "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed". U.S. Const., amend. VI.

**24.** We note that district courts in both the First Circuit and the District of Columbia Circuit have upheld the constitutionality of anonymous juries. *See United States v. Pasciuti*, 803 F.Supp. 499 (D.N.H.1992); *United States v. Edmond*, 730 F.Supp. 1144 (D.D.C.1990).

501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976) ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice."). The presumption of innocence does not, however, eliminate from the courtroom every reminder that the State has charged the defendant with criminal conduct. *See Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986) (holding that presence of armed, uniformed state troopers in courtroom is not infringement on presumption of innocence). Hence, the Second Circuit has articulated, and we adopt, the following principle: "In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *Paccione,* 949 F.2d at 1192.

Sufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment. *See id.* For instance, in *Paccione,* the Second Circuit affirmed the empanelment of an anonymous jury because the prosecution had reliable reason to believe the defendants had strong ties to organized crime, the defendants were facing lengthy prison sentences and high monetary penalties, witnesses had been killed or threatened, and the case had been, and could be expected to continue to be, the subject of much publicity. *Id.* at 1192–93. Similarly, the Seventh Circuit determined that the use of an anonymous jury was justified where the government alleged a pattern of violence by members of the defendants' organization, including the murder of a witness, the defendants

had attempted to influence or intimidate witnesses, and there had been extensive pretrial publicity about the case. *Crockett,* 979 F.2d at 1216. *See Scarfo,* 850 F.2d at 1023 ("Juror's [sic] fears of retaliation from criminal defendants are not hypothetical; such apprehension has been documented.") (collecting cases).

Where jury anonymity is warranted, the defendant's fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias toward issues in the case or to the defendant himself. *See Paccione,* 949 F.2d at 1192. Additionally, the danger that the jury might infer that the need for anonymity was attributable to the defendant's character is minimized when the trial court gives the jurors a plausible and nonprejudicial reason for hiding their identities. *Id.* Thus, for example, in *Thomas,* the Second Circuit found the court's explanation that jurors were not to reveal their identities to deter unwanted press attention "substantially avoided any risk of aspersions on the defendants." 757 F.2d at 1365. Taking the opposite tact, the trial judge in *Scarfo,* in instructions upheld by the Third Circuit, informed the jury that they would hear testimony about organized crime and that he wanted them to consider the case without apprehension that they or their families would be endangered. 850 F.2d at 1026–28. The judge further stated that there was no basis for concern and that anonymity was intended to protect the interests of both the government and the defendants to ensure that both sides received a fair trial. *Id.* at 1027.

The court here did not abuse its discretion in ordering an anonymous jury. First, Appellant, the leader of a large-scale criminal organization, was actively involved in organized crime. Second, that organization had the means to harm jurors and had in fact committed prior acts of violence. Third, Appellant had previously attempted to interfere with the judicial process by ordering the death of Singer, a potential witness against Appellant. The government had also averred before trial that there had been three separate incidents of violence directed

at the relatives of Raul and Roberto Aspuru, potential government witnesses.[25] Appellant also offered bribes to government witness Bertram Gordon and to the officer who arrested Appellant. Finally, Appellant faced the possibility of a life sentence and extensive monetary penalties. Consequently, the court correctly found strong reason to empanel an anonymous jury.[26]

25. The prosecution specifically alleged that shortly before Appellant's trial, (1) the Aspurus' sister was accosted at her home, beaten, and placed in the trunk of a car with her children; (2) persons falsely identifying themselves as federal agents approached the Aspurus' uncle and two employees, handcuffed them in a padlocked trailer, and ransacked the uncle's property; and (3) unknown persons fired shots into the residence of another Aspuru relative. Even though the government did not prove that these incidents were related to Appellant or another co-conspirator, the court nevertheless properly considered them in establishing an anonymous jury. *See Crockett*, 979 F.2d at 1216 (presence of factor militating in favor of anonymous jury is judged from pretrial perspective of trial court).

26. The court's finding that the pretrial publicity in this case also warranted an anonymous jury was erroneous. This case received minimal pretrial publicity, including two newspaper stories and one radio report. Nonetheless, the degree of pretrial publicity is not dispositive as to whether to empanel an anonymous jury. *See United States v. Melendez*, 743 F.Supp. 134 (E.D.N.Y. 1990) (ordering anonymous jury despite specifically finding that case had attracted little publicity), *aff'd without op.*, 999 F.2d 538 (2d Cir.1993). Rather, in determining whether or not to empanel an anonymous jury, courts should look to the totality of the circumstances.

Furthermore, to the extent that the court based its finding on Appellant's dealings with the Sicilian Mafia and the Irish Republican Army, it erred. *See United States v. Vario*, 943 F.2d 236, 241 (2d Cir.1991) (holding that mere invocation of names of organized crime groups is insufficient basis to order anonymous jury), *cert. denied*, —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). We nonetheless affirm the court's decision based on the other grounds discussed in the text.

27. The court's instruction to the venire was as follows:

THE COURT: Be seated. Ladies and gentlemen, I would like to make a comment to you concerning the manner in which you are to be selected and the manner in which you are going to be treated throughout this trial if you are selected as one of the individuals actually sitting on the trial jury.

Moreover, the court took reasonable steps to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights were protected. The court explained to the jury that it wanted to insulate them from improper communication from either side and that its decision was no reflection on the defense.[27] Thus, the court's careful instruction eviscerated any possible inference

Now in a case which is expected to attract a high degree of publicity and be a high-profile case, prudence dictates that certain steps be taken to ensure the integrity of the jury, itself. Both sides of this proceeding want to make sure that your verdict is based on the law from which you will be instructed and the evidence developed in the courtroom throughout the course of this trial in the presence of the Court, the defendant, the attorneys, and the jury, without being influenced by any other factors, whatsoever.

Now one of the methods employed to ensure the viability of the jury and to protect the jury members from any unwanted phone calls or contact by the press or by any person concerning this trial, is to not make your name, where you live, or where you or your spouse work, public. This procedure is known as an anonymous jury, which is not altogether an accurate description, but it does emphasize the fact that your name, address, and place of employment for you and your spouse will not be disclosed to anyone, including the government and the defense attorneys.

Now there must be some exceptions, but they are few. First, the jury clerk has a list of your names for official use, only, such as summoning you to jury duty, checking you in at the beginning of the trial, and issuing your jury paychecks. This list, however, has not and will not be disclosed to any person without an order from this Court.

Secondly, you will be placed under the charge of the United States Marshal, once the jury to try this case has been selected; and if the need arises, your name, et cetera, may be disclosed to the Marshal. However, the Marshal has been instructed not to disclose any personal information about you to any person, including the United States Attorney.

Now in any potentially high-profile case, we are all subject to crank phone calls and anonymous letters and that sort of thing. I want to protect the defendant, as well as the government, from any belief on any part of the jury that any such communications are coming from one side or the other. In other words, I don't want the defendant to be characterized as someone who would be sending anonymous communications to the jury, and I don't want the government to be characterized as someone who is trying to influence the jury improperly.

of Appellant's guilt arising from the use of an anonymous jury.[28] Accordingly, although we do not mean to say that the practice of empaneling an anonymous jury is constitutional in all cases and although we feel that courts should be highly circumspect in ordering the empanelment of anonymous juries, the court did not abuse its discretion by empaneling an anonymous jury in this case.

### E. Disqualification of Appellant's Choice of Counsel

■ Appellant next contends that the district court's disqualification of his counsel of choice violated his Sixth Amendment right to legal representation. At trial, the government called Roberto Aspuru, who had pled guilty to drug-related charges appertaining to the indictment against Appellant. Prior to and separate from this plea, Roberto Aspuru was represented by Martin Weinberg in a drug-related prosecution in the Western District of Louisiana. In connection with this representation, Roberto Aspuru had met with and paid $40,000 to Joseph Oteri, Weinberg's partner. This representation ended when Roberto Aspuru and the government entered into a plea agreement.

■ At trial, the law firm of Oteri, Weinberg, and Lawson, the same firm that represented Roberto Aspuru in Louisiana, represented Appellant. James Lawson was the primary attorney for Appellant, assisted by Oteri. The government alleged, and the court agreed, that Roberto Aspuru's previous contacts with Weinberg and Oteri provided grounds for the disqualification of the firm as Appellant's counsel in this case. A trial court's decision to disqualify the defendant's counsel is reviewed for abuse of discretion. *Wheat v. United States*, 486 U.S. 153, 163, 164, 108 S.Ct. 1692, 1699–1700, 100 L.Ed.2d 140 (1988).

■ The Sixth Amendment guarantees criminal defendants that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." More than sixty years ago, the Supreme Court recognized that an essential part of that right is the accused's ability to select the counsel of his choice. *See Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."). Thus, a criminal defendant has a presumptive right to counsel of choice, *Wheat*, 486 U.S. at 164, 108 S.Ct. at 1700, and

---

Now the use of an anonymous jury is to ensure that both sides will get a fair trial. It's not being done because of any apprehension on the part of this Court that you would have been endangered or subject to improper pressures if your names had been disclosed. Your names have not been disclosed to either side, and that is the way we're going to keep it, just to be sure that there is no suggestion on anybody's part of anything improper from either side.

The fact that you are anonymously selected is not in any way a reflection upon the defendant or the defense or anyone associated with the defense. It is simply a precautionary measure to make sure both sides get a fair trial.

I wish, also, to talk to you about what may be interpreted as increased security at the courthouse. Many factors play a part in the Marshal's decision, which has been approved by this Court, as to the type of security and the number of personnel who will be working this trial.

For instance, the anticipated publicity that may be generated, the number and types of witnesses who may be called, the length of the trial, and the necessity that all public trials in buildings where the Court is housed be conducted in a secure environment.

Now we can all remember the days when such security measures were unheard of, but that is not the world in which we now live.

You should not be concerned about your safety or the safety of anyone connected to this trial; and above all, you must not allow these obvious security measures to influence you in your deliberations and verdict; and you must not in any manner allow these security procedures to suggest that you have any fear of the defendant or the government attempting to interfere with you. The security measures are intended to protect the defendant and the government, as well as all others associated with this proceeding.

28. Indeed, Appellant concedes that "the trial judge made an effort to be even-handed in his instructions," and Appellant does not claim that the empaneling of an anonymous jury limited his ability to conduct voir dire. We nevertheless note that the court conducted a searching voir dire that sufficiently enabled Appellant to examine the venirepersons and to obtain a fair and impartial jury.

courts should hesitate to disqualify defense counsel.

▮▮▮▮ Notwithstanding the importance of the right to counsel of choice, that right is not absolute. In determining whether or not to disqualify defense counsel, the court must balance two Sixth Amendment rights: (1) the right to be represented by counsel of choice and (2) the right to a defense conducted by an attorney who is free of conflicts of interest. *Id.* at 160, 108 S.Ct. at 1697. The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial. *See United States v. Casiano,* 929 F.2d 1046, 1052 (5th Cir.1991). When an actual conflict of interest exists, the client is denied effective assistance of counsel, and the attorney may be disqualified. *United States v. Martinez,* 630 F.2d 361, 362 (5th Cir.1980), *cert. denied,* 450 U.S. 922, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981). Indeed, even a potential conflict suffices for disqualification. *Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700 ("a showing of a serious potential for conflict" overcomes presumption in favor of defendant's counsel of choice). Furthermore, if one attorney in a firm has an actual conflict of interest, we impute that conflict to all the attorneys in the firm, subjecting the entire firm to disqualification. *United States v. Kitchin,* 592 F.2d 900, 904 (5th Cir.), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979). *See* RULES REGULATING THE FLORIDA BAR §§ 4–1.7, 4–1.9 & 4–1.10 (incorporating above-described standards).

▮▮▮▮ In deciding whether the actual or potential conflict warrants disqualification, we examine whether the subject matter of the first representation is substantially related to that of the second. *Kitchin,* 592 F.2d at 904; *see United States v. James,* 708 F.2d

40, 46 (2d Cir.1983). Our goal is to discover whether the defense lawyer has divided loyalties that prevent him from effectively representing the defendant. *See United States v. Moscony,* 927 F.2d 742, 750 (3d Cir.), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991). If the conflict could cause the defense attorney improperly to use privileged communications in cross-examination, then disqualification is appropriate. Indeed, it is also true that disqualification is equally appropriate if the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client or to advance the attorney's own personal interest. In short, the court must protect its independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards.

Here, the court properly concluded that Appellant's counsel of choice suffered insurmountable conflict of interest problems. First, the Louisiana case in which Roberto Aspuru was represented by counsel from the disqualified law firm involved a conspiracy to import and distribute narcotics between, among others, Roberto Aspuru and certain Colombians, and the government intended to show that Appellant joined this conspiracy to obtain a source for drugs to distribute as part of an ongoing conspiracy centered in Montreal, Canada. Further, at the time the court disqualified Appellant's counsel of choice, a serious potential for conflict of interest existed. Roberto Aspuru claimed that he gave money to Oteri as a retainer. Testimony about this transaction would have opened the door to potential conflict, as defense counsel could either have tread dangerously close to confidential matters in attempting to explain this transaction or, alternatively, could have improperly avoided related issues.[29] Considering these factors, we

---

29. Moreover, the government averred that it contemplated presenting proof at trial that an attorney formerly retained by Appellant and accused of obstructing the lawful investigation in this case met with Appellant in the presence of Oteri, raising conflict of interest questions. *See Government of Virgin Islands v. Zepp,* 748 F.2d 125, 136 (3d Cir.1984) ("when defense counsel has

independent personal information regarding the facts underlying his client's charges, ... he has an actual conflict of interest."). The fact that the government did not elicit testimony from Aspuru that he had paid Oteri money nor testimony about the aforementioned meeting is inconsequential. The decision whether disqualification is proper is judged from the perspective of the

find that there were actual, and potential, conflicts that could have impeded the trial and undermined the integrity of the judicial system.

 Even where an actual conflict exists subjecting the attorney to disqualification, the client may waive this conflict of interest and elect to have the attorney continue representation, so long as that waiver is knowing, intelligent, and voluntary. *Martinez,* 630 F.2d at 362. In this case, Appellant expressly and unconditionally waived his right to conflict-free representation. Nonetheless, a court need not accept a waiver of the right. *Wheat,* 486 U.S. at 162, 108 S.Ct. at 1698–99 (holding that trial courts may refuse waivers of conflicts of interest to ensure adequacy of representation, to protect integrity of court, and to preserve trial judge's interest to be free from future attacks over adequacy of waiver and fairness of trial). Additionally:

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

*Id.* at 160, 108 S.Ct. at 1698. As discussed above, the court was confronted with several actual or potential conflicts of interest. If realized, any of the above-discussed conflicts would have rendered the court's verdict suspect and Appellant's assistance of counsel unethical and ineffective. Accordingly, the court did not abuse its discretion by refusing to accept Appellant's waiver of his right to conflict-free representation and by disqualifying Appellant's first choice of counsel.[30]

### F. Admission of Appellant's Acts of Violence

 After hearing argument on the admission of testimony regarding (1) the killing of April, (2) the execution-style murder of Singer, and (3) the shooting of a state trooper, the district court denied Appellant's motion to exclude the evidence pursuant to Federal Rule of Evidence 403. We affirm the court's ruling. Relevant evidence may be excluded under Rule 403 only when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." FED.R.EVID. 403. We have repeatedly stated that Rule 403 is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence. *See, e.g., United States v. Chandler,* 996 F.2d 1073, 1101 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994) (No. 93–1033). Thus, we review a court's decision not to exclude evidence pursuant to Rule 403 for an abuse of discretion. *United States v. Sanchez,* 992 F.2d 1143, 1160 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994).

In *United States v. Dekle,* 768 F.2d 1257, 1262–63 (11th Cir.1985), we upheld the court's admission of evidence of a defendant's uncharged assault on a third person who allegedly conspired to steal marijuana from the defendants. In *United States v. Church,* 955 F.2d 688, 700 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992), we approved the admission of an uncharged murder to show the

---

trial court at the time of disqualification. *Wheat,* 486 U.S. at 162–64, 108 S.Ct. at 1698–1700.

**30.** We need not reach the issue whether the erroneous denial of the right to counsel of choice is *per se* reversible error. *See United States v. Urbana,* 770 F.Supp. 1552, 1556 n. 9 (S.D.Fla. 1991) (collecting circuit court cases that hold that denial of criminal defendant's qualified right to certain counsel of his choice is reversible error regardless whether prejudice is shown). Indeed, the Supreme Court has never held that prejudice is a prerequisite to reversal of a conviction for violation of the Sixth Amendment right to counsel of choice. *See, e.g., Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 443, 105 S.Ct. 2757, 2767, 86 L.Ed.2d 340 (1985); *id.* (Stevens, J., dissenting on other grounds) ("[I]n a criminal case an erroneous order disqualifying the lawyer chosen by the defendant should result in a virtually automatic reversal."); *Flanagan v. United States,* 465 U.S. 259, 268–69, 104 S.Ct. 1051, 1056–57, 79 L.Ed.2d 288 (1984).

motive for a murder conspiracy charged as a RICO predicate act. Similarly, we agree with the court that although Appellant's direction of violent acts was uncharged in the indictment, these acts were intertwined with the drug conspiracy and probative of Appellant's role in the conspiracy.[31] Further, we find nothing "unfair" in the prejudice that the evidence caused to Appellant. Accordingly, the court did not abuse its discretion by admitting the evidence.[32]

## III. CONCLUSION

Appellant's convictions are AFFIRMED.

BLACK, Circuit Judge, specially concurring:

I concur in the panel opinion. I write separately to express my belief that our holding on the admissibility of the wiretap transcripts must be confined to the unique circumstances of this case. The majority opinion should not be read so broadly as to allow virtually automatic admission of purported wiretap transcripts whenever original recordings of a conversation are missing through no bad faith on the part of the Government. That would be an expansive and dangerous precedent. I concur here because of the particular facts of this case and because of the commendable efforts of the district court judge to ensure the reliability of *these* transcripts.

As the panel opinion notes, the district court admitted transcripts of thirteen telephone conversations intercepted in Spain by the Spanish National Police. Several of the co-conspirators in this case participated in those conversations, and Appellant Ross was identified as a participant in five of the con-

versations. The district court admitted the transcripts only after satisfying itself that they were an accurate account of actual conversations that had been recorded pursuant to a Spanish-court-ordered wiretap. The actual recordings, made in 1988, were not available at the time of trial in 1992.[1]

Before deciding to admit the transcripts as other evidence of the contents of the wiretap recordings under Rule 1004, the district court conducted an evidentiary hearing. That hearing included testimony from David Sabio, a co-conspirator turned Government witness who participated in five of the thirteen transcribed conversations, none of which were with Ross. The district court also heard from one former and one current Spanish police officer, who had listened to the wiretap recordings and made the original Spanish transcriptions. The Spanish police identified Ross as a participant in his five conversations. Numerous other witnesses tied Ross to the drug conspiracy in other ways.

At the evidentiary hearing, Sabio testified that the transcripts accurately matched his recollection of the five telephone conversations he participated in during his time in Spain in 1988. He specifically recalled that each of the five conversations had occurred, the name of the other participating party, and the general content of each of the conversations. Further, Sabio testified that the general content was accurately portrayed in the transcripts. On cross-examination by Appellant's counsel, Sabio testified that literal translations of certain unflattering colloquial expressions used by others to address him as a greeting were perfect translations of the words used, rather than interpreta-

---

31. The evidence indicated that (1) the bombing murder of April established Appellant as the head of the West End Gang, (2) Singer was murdered at Appellant's direction to silence a police informant, and (3) the state trooper was likely shot incidental to the escape from Singer's murder. All three acts of violence were committed to protect the West End Gang and to advance its drug sales.

32. Appellant lastly contends that the district court erred by not specially instructing the jury that it had to agree unanimously on the three predicate acts required for a conviction for con-

ducting a continuing criminal enterprise, pursuant to 21 U.S.C.A. § 848. Instead of giving the special instruction, the court instead substantially adhered to the relevant Eleventh Circuit Pattern Jury Instruction. This claim is without any merit. *See United States v. Lehder–Rivas*, 955 F.2d 1510, 1519 n. 6 (11th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992).

1. Testimony indicated that no charges were ever brought in Spain as a result of this investigation. It is, therefore, not surprising that the cassette tapes were not available at the time of trial.

tions of the meanings of those words. He further verified the accuracy of the transcripts by noting that the unusual nature of the greetings made the conversations memorable for him. Sabio also testified that he could not say that the transcripts contained the exact words used by the parties in every conversation, but that he believed the conversations were carried on essentially as transcribed.

The two Spanish police officers told the district court how they made all thirteen original transcripts. They testified that all phone conversations from two wiretapped phones were originally recorded on a master tape. A Spanish police officer then listened to the master tape and identified conversations that related to their ongoing investigation. The recordings of those conversations were duplicated onto cassette tapes and the master tape was then reused. Generally, the Spanish police made a Spanish language transcript of the conversation while listening to the duplicate cassette, but on certain occasions the transcript was made directly from the master tape. The district court noted that the procedures followed fell short of the safeguards provided in this country by 18 U.S.C. § 2516, but comported with Spanish law.

Defense counsel had ample opportunity to cross-examine the Spanish police officers in front of the jury on the procedures that they followed in making the transcripts and on the accuracy of their identification of the participants. Sabio was also available to the defense for testimony regarding the accuracy of the transcripts but, not surprisingly, he was not called, presumably because his testimony supports the accuracy of the transcripts. Interestingly, the Government did not bolster the reliability of the transcripts for the jury by re-calling Sabio as a witness after the transcripts had been ruled admissible. Sabio had been called as a Government witness prior to the proffer of the transcripts, and naturally his testimony at that time made no mention of the transcripts. Thus, the jury weighed the value of the transcripts without the benefit of Sabio's testimony supporting their accuracy.

It is important to note that the United States government played no role whatsoever in either the preparation or destruction of the master recordings or the cassette tapes. There is no question that these transcripts meet Rule 1004's requirement that the original recording not be lost through bad faith on the part of the proponent. Fed.R.Evid. 1004(1). There is also no question that, given Sabio's testimony, admission of the five transcripts of conversations involving him cause no concern. I agree that the admission of the remaining eight transcripts is troublesome. I am, however, satisfied that the evidentiary hearing demonstrated that the transcripts were indeed reliable. Under the circumstances, involving the actions of a foreign government and not the United States government, I agree that they were properly admitted. I reiterate, however, that our holding on this issue should be confined to the unique circumstances presented in this case.