[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 24, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-14154

_____

D. C. Docket No. 05-20915-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILFREDO ROBLES,
a.k.a. Willy,
JAIRO RAFAEL SANZ DE LA ROSA,
RUDY ALBERTO RODRIGUEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(June 24, 2008)**

Before BIRCH, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

In this multi-count drug conspiracy case, Jairo Rafael Sanz de la Rosa

("Sanz") and Wilfredo Robles appeal their convictions and sentences, and Rudy Rodriguez appeals his conviction. After a thorough review of the record and upon hearing oral argument, we affirm the convictions of all defendants, but vacate and remand Robles appeal for resentencing.

**I.**

Sanz, Robles, and Rodriguez were charged along with Jorge Isaacs Diaz ("Isaacs"), Orlando Gonzalez-Perez ("Gonzalez-Perez"), and Humberto Rua in a three-count indictment.[1] Count 1 charged all defendants with conspiracy to import five kilograms of more of cocaine, in violation of 21 U.S.C. §§ 952, 960(b), and 963. Count 2 alleged that all defendants engaged in conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. Count 3 charged Sanz, Isaacs, and Rua with possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841.

A. Pre-trial Motions

1. Motion to Suppress Wiretap Evidence

United States DEA Agents began investigating the Del Toro drug ring in 2004. Wiretaps issued as part of that investigation identified Del Toro, William de Jesus Arias, Jorge Cuadra, Sanz, and Gonzalez-Perez as sources of cocaine in the

---

[1] Rua was eventually dismissed from the indictment. Isaacs pleaded guilty to a single count and testified for the government. Gonzalez-Perez fled and was tried separately.

United States. The scheme involved an extensive structure of importation and distribution "cells." One such cell was under Sanz's leadership. The participants in the scheme used multiple phones to compartmentalize the cells and limit liability. In December 2004, as a result of intercepted calls, U.S. authorities were able to seize over twenty kilograms of cocaine that Del Toro imported using cargo planes.

In February 2005, U.S. DEA agents obtained information from a confidential informant regarding importation of drugs through Miami International Airport using airport employees. The informant confirmed that Sanz was involved in narcotics importation using Isaacs, an airport employee and Sanz's cousin, to remove drugs from incoming planes. In June 2005, Colombian officials intercepted a call, pursuant to a Colombian-issued wiretap, which led United States DEA agents to believe that Sanz was planning to import narcotics with Del Toro. In August 2005, Colombian authorities intercepted a call to Del Toro from Sanz at 786-426-7009 (target phone 1). Del Toro later informed Arias that Sanz's number was 786-356-9973 (target phone 2). Throughout August, Colombian authorities intercepted calls on these two phones concerning narcotics deliveries. Agents were able to intercept calls from Gonzalez-Perez and Isaacs to target phone 1. Intercepted calls to target phone 2 identified Del Toro, Arias, and Isaacs as

3

participants.

Based on this information, the U.S. government requested wiretaps for target phones 1 and 2 in September 2005. According to the affidavit, there was probable cause to believe agents would intercept calls connected to drug trafficking by Del Toro, Sanz, Arias, Isaacs, and others, via the two targeted phones. The government explained that the intercepted calls would reveal evidence of the participants in drug trafficking offenses, and that other normal investigative techniques had failed. Specifically, the affidavit explained that traditional methods such as surveillance, pen registers, and confidential informants had been of limited use due to the international scope of the scheme and Sanz's ability to conceal his location and identity. The affidavit also confirmed that confidential informant had been arrested and could no longer provide new information. The affiant further explained why other techniques such as subpoenas, interviews, and undercover operations would not be successful and would draw attention to the investigation. According to the affidavit, the wiretaps would enable agents to identify additional participants and their locations, and permit surveillance without alerting the participants to the investigation. Finally, the affidavit confirmed that agents would take all necessary steps to minimize the interceptions. The district court concluded that the affidavit established probable cause and issued the wiretap authorization

4

for thirty days.

As a result of the initial wiretaps, U.S. agents intercepted numerous calls between Isaacs and Sanz, and Del Toro and Sanz, which calls agents believed used code words to discuss deliveries. In a September 30, 2005 call, Gonzalez-Perez called Sanz on target phone 1. Agents believed this call involved an attempted delivery of drugs to Willie. According to a criminal database, Robles's alias was "Willie."[2]

The government obtained a second wiretap in November 2005 for target phone one and a new number 786-356-2676, which agents believed was another phone assigned to Sanz. The government informed the court that target phone one was being used by Sanz and the former target phone 2 (the 9973 number) was being used by Gonzalez-Perez. Agents identified about 100 calls between target phone 1 and former target phone 2, leading them to believe that Gonzalez-Perez was a participant in the narcotics scheme. Through the second authorizations, agents expected to intercept calls from Sanz, Gonzalez-Perez, Del Toro, Arias, and Robles, among others. According to the affidavit, continued wiretaps could assist in identifying additional participants and narcotics deliveries. The remainder of the

---

[2] Throughout the transcripts, Willie is spelled as both "Willie" and "Willy." It is unclear whether the difference is spelling is intended to differentiate between Willie Robles and Willie Arias. For purposes of this opinion, we use the spelling Willie for both.

affidavit detailed the reasons the wiretap was necessary, the failure of other investigative techniques, and the methods of minimization. The district court granted authorization.

Rodriguez and Sanz moved to suppress the wiretap evidence on the grounds that the government had, inter alia (1) failed to show necessity, (2) used boilerplate and non-specific language in the affidavit, and (3) failed to comply with the requirements in 18 U.S.C. § § 2515 and 2518. They also requested a Franks[3] hearing, alleging that the affidavits were contradictory and false. The district court denied the motion to suppress and for a Franks hearing, concluding that the affidavit accompanying the September 2005 wiretap application sufficiently explained why traditional techniques would not work and was detailed and specific. The court also found that there was no allegation of deliberate falsehood in the application and no evidence that the affidavit contained false or deliberately misleading statements.

### 2. Motion for a Continuance

Prior to trial, the defendants filed several motions for continuances. In particular, Rodriguez sought continuances in order to obtain different counsel. The court granted these motions. Eleven days before trial was to commence, Rodriguez

---

[3] Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

filed another motion for a continuance, again to seek new counsel. The court

denied this motion, stating that it would permit substitution of counsel only on the

condition that incoming counsel comply with the court's calendar.

B. Evidence at Trial

Sanz and Isaacs each testified to their roles in the conspiracy. Isaacs

confirmed that he and Sanz imported cocaine by cargo plane. Each shipment

consisted of individual bars, or bricks, of cocaine wrapped in black electrical tape.

Each brick weighed about 200 grams and each shipment contained between 3 and

6 bricks. Between 2004 and 2005, Isaacs and Sanz imported about eighteen such

shipments. When Sanz and Isaacs were arrested, agents discovered just under one

kilogram of cocaine in their possession.

In September 2005, Sanz and Isaacs were attempting to unload a shipment of

800 grams of cocaine, but were having difficulty due to the poor quality of the

drugs. Agents believed Sanz and Isaacs wanted Robles to sell these drugs.

Both Sanz and Isaacs denied involvement with Robles. And Isaacs denied

any knowledge of either Robles or Rodriguez. Isaacs did identify two men

involved in the distribution: one who had a restricted drivers license and another

who owned a used car lot. The evidence established that Rodriguez owned a used

car lot and that Robles had a restricted drivers license. Sanz stated that he knew

7

Willie Arias through his dealings with Cuadra and that he had sold Willie drugs in the past. Arias also had a restricted drivers license. Cuadra confirmed Sanz's involvement in the importation and distribution scheme, but denied knowing Rodriguez or Robles. He admitted that he knew someone named Willie, but he did not know Willie's last name and did not see him in the courtroom.

1. Robles

The DEA learned of Robles when it intercepted calls on September 29 and 30 and agents believed the content of these calls confirmed Robles's role in the conspiracy. In a call on September 29, Robles and Gonzalez-Perez discussed moving Gonzalez-Perez' boat from his trailer. Robles owned a trucking company and had access to a flatbed truck and forklift through his partner. In a conversation that same afternoon, Gonzalez-Perez informed Sanz that Willie was coming over to see about moving the boat that day or the next. On the morning of September 30, the government intercepted a call between Robles and Gonzalez-Perez in which Robles asked Gonzalez-Perez if he had "talked to the partner yet . . . the one in the trailer." Gonzalez-Perez responded no, that he had been waiting for Robles. DEA agent Stephen Kepper explained that the partner referred to Sanz, who shared the trailer with Gonzalez-Perez. Robles then told Gonzalez-Perez "I told you to call him so you guys could work things out" and Robles offered to give Gonzalez-

Perez the partner's number. There was no evidence that Robles had Sanz's phone number. Gonzalez-Perez indicated that he was getting ready to leave the trailer to meet a dealer with Luis[4] and that Luis was checking on the tag. Gonzalez-Perez then told Robles that he would leave the papers. Kepper and Isaacs, who testified as a cooperating witness, explained that "papers" was a code word for drugs. Robles then referred to the trailer and the flatbed. Gonzalez-Perez responded that he had the CDs Robles wanted and he would bring the CDs to Robles in order to work something out. Robles responded "To see them. Okay, well, it's fine." Kepper told the jury CDs was code for drugs.

That afternoon, agents intercepted another call between Sanz and Gonzalez-Perez that confirmed that Willie was headed to the trailer. Authorities wanted to learn Willie's identity and conducted physical surveillance of the trailer park. They observed Robles arrive in his Mercedes and watched as he and several unidentified men stood around the trunk of the car. Although agents noticed a broken-down boat on the property, Robles's car did not have the capability to tow a boat. Gonzalez-Perez met Robles at the trailer, but according to an intercepted call, could not find his key to the trailer. Gonzalez-Perez called Sanz, who indicated the trailer was open and that he was on his way. Because Robles was not

---

[4] Luis's identity is unclear.

9

permitted to drive at night, Robles left the trailer before Sanz arrived.

Later that evening, agents intercepted a call between Isaacs and Sanz in which Sanz stated that he had to go to Homestead, Florida to take an item to the man who had been unable to wait for Sanz at the trailer because he was not permitted to drive at night. Robles did not reside in Homestead.

After his arrest, Robles informed agents that he knew Gonzalez-Perez through his jewelry business and had been to Gonzalez-Perez's trailer where he once observed an unknown amount of cocaine wrapped in black electrical tape. Although Gonzalez-Perez offered Robles the drugs to sell, Robles declined. And although Robles admitted that Gonzalez-Perez showed him drugs, there was no evidence that Robles left the property with the drugs. Robles was not arrested for almost three months following this incident, but there was no evidence that he returned at a later date to pick up the drugs, and no drugs were found at Robles's home when he was arrested.[5]

The government presented Fed. R. Evid. 404(b) evidence that Robles was convicted in 2004 for conspiracy and marijuana trafficking and that in 1997,

---

[5] In a call dated November 16, Gonzalez-Perez informed Sanz that Willlie had been calling and had come by the day before. There was no evidence that Robles had visited with Gonzalez-Perez on November 15, and agents did not intercept any calls involving Robles in October or November.

Robles attempted to purchase cocaine from an undercover officer.[6] When the officer refused to front the drugs, Robles did not pursue the deal.

In his defense, Robles called two witnesses: Imer Diaz and Iliana Cardentey. These two witnesses confirmed that Robles owned a jewelry business and a trucking company and was known as Willie. Diaz explained that he was a driver for Robles's trucking company and twice had accompanied Robles to Gonzalez-Perez's trailer to discuss moving the boat. On the second trip, Robles and Diaz went into the trailer to use the bathroom. Diaz observed Gonzalez-Perez offer Robles a package. Diaz apparently overheard a call between Gonzalez-Perez and Sanz in which Sanz said "It's okay if he leaves, I will bring it to him wherever I need to." According to Diaz, the men could not have been talking about the boat because Sanz could not have moved the boat. Diaz also accompanied Robles to a car dealership on another occasion. They met Gonzalez-Perez at the dealership and, while Robles and Diaz were listening to the radio and sitting in a truck Robles wanted to buy, Gonzalez-Perez told Robles he had some CDs to sell to Robles.

In his closing argument, Robles argued that he was the victim of mistaken identity and the Willie involved in drugs was Arias, who also had a suspended license.

---

[6] The court issued limiting instructions on the proper use of this evidence.

11

## 2. Rodriguez

Rodriguez also was not an initial target of the investigation, but authorities identified Rodriguez as a participant after they intercepted several calls between Sanz, Gonzalez-Perez, and Rodriguez in October and November 2005. In those calls, the parties refer to "satellites," "deep snow," and "remote controls," which the government proffered and cooperating witnesses testified were code words for cocaine, and Rodriguez asked if they were "small ones, just like the last time." In another call, Rodriguez and Gonzalez-Perez discuss whether Rodriguez should go to Homestead. Rodriguez asks if there is a "whole one there," which the government proffered referred to a quantity of drugs. In a November call, Sanz asked Rodriguez how it went with his friend with the cars and asked if the friend has any other interest in "a beauty of a car." Sanz later testified that he was trying to sell his own car. He admitted, however, that the call with Rodriguez in which the two discussed remote controls was about drugs.

On November 23, 2005, agents intercepted a call between Rodriguez and Sanz indicating that the two planned to meet. Agents initiated surveillance and followed Sanz to a warehouse area. The agent conducting the surveillance was driving a blue buick. While watching Sanz, agents intercept a call from Rodriguez warning Sanz that he was being followed and giving the exact location and

12

description of the agent. The two cancelled the meeting and agents aborted the surveillance. Isaacs confirmed that Sanz intended to deliver drugs to a man who owned a car dealership, but the delivery was cancelled when the men realized they were being followed.

When Rodriguez was arrested, he cooperated with authorities and permitted a search of his home. Rodriguez admitted to agents that he knew Sanz and knew that Sanz was involved in drugs, but he denied that he had any involvement.

Marcus Mitchell, Rodriguez's cellmate during pre-trial detention, testified that Rodriguez admitted selling drugs and identified his partners as Willie, Orlando, Rafael, and Jorge. Rodriguez also talked about an incident in November 2005, in which Rodriguez was supposed to meet his contact but called it off after he observed a blue buick following the contact.

The jury convicted Robles of conspiracy to possess with intent to distribute cocaine, finding that the amount of drugs involved as less than 500 grams. The jury convicted Rodriguez of conspiracy to possess with intent to distribute cocaine, finding that the amount of drugs was at least 500 grams but less than 5 kilograms. Both defendants were acquitted of the conspiracy to import cocaine offense.

Robles moved for a new trial and for judgment of acquittal, alleging that the evidence was insufficient to sustain his conviction. The court denied the motion.

Robles filed a second motion for a new trial, this time based on newly discovered evidence in the form of affidavits from Gonzalez-Perez, Sanz, and Rodriguez averring that Robles was not involved and the Willie identified at trial was Arias. The court denied the motion, concluding that Robles could not show that the evidence was not discoverable earlier with the exercise of due diligence, or that the evidence was likely to produce a different outcome.

Although the jury concluded that Robles was responsible for less than 500 grams of cocaine, the probation officer calculated the sentencing guidelines range based on the government's assertion that Robles was responsible for between 5 and 15 kilograms of cocaine. With a corresponding offense level of 32, no enhancements or reductions, and a criminal history category III, the guidelines range was 151 to 188 months' imprisonment. Robles objected to the amount of drugs, arguing that he was responsible for only 200 grams - or one brick - of cocaine, which corresponded to the trial testimony that Gonzalez-Perez showed him one brick while Robles was at the trailer. At sentencing, the court rejected the government's assertion and declined to hold Robles responsible for more than 500 grams of cocaine. The court also rejected Robles's argument that he be held responsible for only 200 grams. The court explained that it found Robles accountable for just under the 500 grams attributed to Robles by the jury as

14

reasonably foreseeable amounts in the conspiracy.  With a base offense level of 24,

the range became 63 to 78 months' imprisonment.

Robles requested a sentence at the low end of the range, and, after

considering the arguments, the advisory guidelines range, and the § 3553(a)

factors, the court imposed a sentence of 63 months' imprisonment.

Sanz received a sentence of 188-months' imprisonment on each count, to

run concurrently.  Rodriguez received a sentence of 72 months' imprisonment.

Sanz now appeals, challenging the denial of the motion to suppress and the

sentence imposed.  Robles challenges the sufficiency of the evidence, the denial of

his motions for a new trial, and his sentence.  Rodriguez likewise challenges the

sufficiency of the evidence.  He also raises the denial of the motion for a

continuance.  We address each defendant in turn.[7]

## II.

A. Sanz[8]

We review findings of fact for clear error and the application of the law to

---

[7] After a thorough review of the record, we conclude the district court properly applied the sentencing guidelines and did not abuse its discretion in imposing an 188-month term of imprisonment for Sanz's sentence.  We affirm without further discussion.

[8] In his appellate brief, Sanz indicates that he adopts the arguments made by his codefendants.  Sanz cannot adopt an argument on the sufficiency of the evidence.  See United States v. Khoury, 901 F.2d 948, 963 n.13 (11th Cir. 1990).  The other issues presented are not relevant to Sanz.

those facts de novo. United States v. Newsome, 475 F.3d 1221, 1223 (11th Cir.

2007). All facts are construed in the light most favorable to the prevailing party, in

this case the government. Id. at 1223-24. A district court's finding with respect to

whether an affidavit in support of a wiretap adequately demonstrated that law

enforcement had exhausted normal investigative techniques, as required by 18

U.S.C. § 2518(1)(c), is subject to clear error review. United States v. Weber, 808

F.2d 1422, 1424 (11th Cir. 1987).

Sanz argues that the court erred by denying the motion to suppress because

the government failed to show necessity for the wire tap and proffered "craftily"

drafted affidavits to support its allegations. Sanz contends that, under Franks,[9] the

court should have set aside these reckless and false assertions and considered

whether the remaining evidence supported the warrant.

The government responds that it had shown necessity by establishing that

other investigatory techniques had been exhausted and conventional techniques

were unlikely to produce results. It further asserts that there was no violation

under Franks, as Sanz failed to argue in his motion that there was any intentional

---

[9] In Franks, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search. 438 U.S. at 171-72.

16

misrepresentation or omission in the affidavit.

Under 18 U.S.C. § 2518, an application for a wire tap must include, inter alia: "a full and complete statement of the facts and circumstances relied upon by the applicant . . . including details as to the particular offense . . . , a particular description of . . . the type of communications sought to be intercepted, the identity of the person . . . whose communications are to be intercepted", and "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(b), (c).

The court may then issue an order "if the judge determines on the basis of the facts submitted by the applicant that– (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense . . . ; (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous [and] (d). . . there is probable cause for belief that . . . the facilities from which, or the place where, the . . . communications are to be intercepted are being used, . . . are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. § 2518(3).

17

### Necessity

An application for an order authorizing a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The affidavit supporting an application need not show a "comprehensive exhaustion of all possible techniques," but need explain only the failure of those techniques "that reasonably suggest themselves." United State v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986).

Here, the affiant provided extensive explanation as to the techniques already employed and the reasons why the wire tap was necessary. Accordingly, we conclude that the district court properly determined that the government established necessity.

### Franks Hearing

In order to be entitled to relief, Sanz must show (1) that the alleged misrepresentations or omissions were knowingly or recklessly made by the agent, and (2) that the result of excluding the alleged misrepresentations and including the alleged omissions would have been a lack of probable cause for issuance of the warrants. United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990). Upon

18

review of the motion to suppress and the wiretap application, we conclude that Sanz has not met this burden.

B. Robles[10]

1. Sufficiency of the Evidence

Sufficiency of the evidence is a question of law reviewed <u>de novo</u>, viewing the evidence in the light most favorable to the government and making all inferences and credibility choices in the government's favor.  A conviction must be upheld, "unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." <u>United States v. Chastain</u>, 198 F.3d 1338, 1351 (11th Cir. 1999).  "The prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury." <u>United States v. Sellers</u>, 871 F.2d 1019, 1021 (11th Cir. 1989) (internal quotations and citations omitted).  Additionally, witness credibility is the sole province of the jury.  <u>United States v. Parrado</u>, 911 F.2d 1567, 1571 (11th Cir. 1990),

---

[10]  At the close of the government's case, all defendants moved for judgment of acquittal, which the court denied.  The parties renewed the motions at the close of all evidence, and the court again denied the motions.

Both Rodriguez and Robles were convicted of conspiracy to possess with intent to distribute cocaine. Conspiracy to possess cocaine with intent to distribute requires the government to prove beyond a reasonable doubt "(1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006) (quotation omitted). The agreement forming the basis of the conspiracy can be proved "by circumstantial evidence, through 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'" United States v. Obregon, 893 F.2d 1307, 1311 (11th Cir. 1990) (citation omitted). "Where the government's case is circumstantial, reasonable inferences, and not mere speculation, must support the jury's verdict." United States v. Meija, 97 F.3d 1391, 1392 (11th Cir. 1996).

Moreover, although presence is a permissible factor to be considered in determining whether a defendant conspired with another, "it is well settled that mere presence will not support a conviction." United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002). "Mere presence, guilty knowledge, even sympathetic observation" and close association with a co-conspirator are insufficient, without more, to support a conviction for conspiracy to distribute drugs. United States v. Lyons, 53 F.3d 1198, 1201 (11th Cir. 1995). Yet, such factors may raise a

20

permissible inference of participation in a conspiracy, which the jury may consider as a "material and probative factor . . . in reaching its decision." United States v. Hernandez, 896 F.2d 513, 518 (11th Cir. 1990).

Robles argues that there was no evidence of any agreement and no evidence to connect him to the cocaine. He asserts that the evidence supported his claim that he was involved with Gonzalez-Perez solely to move a boat from Gonzalez-Perez's property. The government responds that the September 30 telephone call between Robles and Gonzalez-Perez was sufficient for the jury to conclude that there was an agreement to possess the drugs. The government further explains that there was other evidence of Robles's intent: Robles had been in the trailer and seen the cocaine, Robles had a prior conviction for drugs, and Rodriguez's cell mate identified Willie as one of the men Rodriguez stated was involved in the drug distribution.

Upon review of the record, we conclude that the evidence was sufficient to establish Robles's participation in a conspiracy to possess cocaine with the intent to distribute it. The jury listened to the testimony of Robles's co-conspirators and found that their denials of Robles's involvement lacked credibility, a decision with which we do not interfere. "The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial," Sellers,

871 F.2d at 1021, but we are not. We "must accept all reasonable inferences and credibility determinations made by the jury." Id.

The jury was entitled to credit the testimony of Isaacs and agent Kepper that "CD" referred to cocaine and the testimony of agent Kepper that "papers" referred to narcotics and narcotics related items. We have repeatedly held that it is reasonable for a jury to find that conversations that contain coded language are about narcotics when agents or coconspirators familiar with the conspiracy have testified that the codes refer to narcotics. See United States v. Garcia, 447 F.3d 1327, 1339 (11th Cir. 2006); United States v. Atkins, 618 F.2d 366, 369–370 (5th Cir. 1980).[11] If we accept the credibility determinations made by the jury, as our standard of review requires, we must read the conversation between Gonzalez and Robles as an express agreement for Gonzalez to bring units of cocaine to Robles.

"Conspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators," DeLong Equipment Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1515 (11th Cir. 1989), but both explicit agreement and the conduct of the conspirators establishes the conspiracy at issue in this appeal. The evidence

---

[11] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this court held that all decisions handed down by the former Fifth Circuit before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit.

22

establishes Robles's conspiracy by the explicit agreement that Gonzalez made on the telephone to deliver cocaine to Robles and inferences that may be fairly drawn from the behavior of Robles in going to the trailer where the delivery was to occur and Sanz in explaining to Isaacs that a person had come to pick up cocaine.

The evidence of prior drug activity only strengthens our conclusion, as these convictions may establish intent. United States v. Roberts, 619 F.2d 379, 383 (5th Cir. 1980) (holding that a prior conviction increases the likelihood that the defendant intended to conspire to commit similar subsequent criminal conduct).

Finally, Mitchell testified that Rodriguez identified a man named Willie as another participant in the drug scheme. According to the crime database, Robles's alias was Willie. Therefore, viewing the evidence in the light most favorable to the government, the evidence sufficiently established that Robles knew of an agreement and voluntarily joined it.

### 2. Motion for a New Trial

Robles argues that the government failed to disclose information on William Arias and Arias's suspended license, and that there is a reasonable probability the outcome of the trial would have been different had the defense been given this information. Robles further asserts that the court erred by denying his motion for a new trial because Gonzalez-Perez's affidavit was new evidence not available

23

earlier given that Gonzalez-Perez was a fugitive. The government responds that courts are skeptical of proffers from codefendants, and thus, Gonzalez-Perez's affidavit does not meet the test for new evidence. With respect to Arias's information, the government contends it was available to Robles before trial and was a matter of public record.

The district court may grant a motion for new trial based on such evidence if the interest of justice so requires and if (1) the evidence was in fact discovered after trial, (2) the defendant exercised due care to discover the evidence, (3) the evidence was not merely cumulative or impeaching, (4) the evidence was material, and (5) the evidence was of such a nature that a new trial would probably produce a different result. Fed. R. Crim. P. 33(a); United States v. Lee, 68 F.3d 1267, 1273-74 (11th Cir. 1995). Each element of this test must be satisfied or else a new trial is not warranted. Lee, 68 F.3d at 1273-74. Furthermore, motions for new trial are "highly disfavored," and district courts "should use great caution in granting a new trial motion based on newly discovered evidence." United States v. Jernigan, 341 F.3d 1273, 1287 (11th Cir. 2003) (quotation omitted).

In order to obtain a new trial based on an asserted Brady violation, the defendant must show that: (1) the government possessed evidence favorable to the defendant; (2) the defendant does not possess the evidence and could not obtain the

24

evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different. United States v. Vallejo, 297 F.3d 1154, 1164 (11th Cir. 2002). "Failure to meet any one of these elements will defeat a motion for a new trial." United States v. Starrett, 55 F.3d 1525, 1554 (11th Cir. 1995). Where, as here, a defendant fails to raise a Brady claim at trial, we review for plain error.

### a. Gonzalez-Perez's affidavit

Gonzalez-Perez's affidavit allegedly cleared Robles of any participation in the conspiracy. These statements, however, were cumulative to the testimony given by Sanz, Isaacs, and Cuadra. Notably, new trials are disfavored, especially when premised on statements by codefendants. Accordingly, we find no error in the court's refusal to grant a new trial based on this evidence.

### b. Arias's information

Robles challenges Arias's information as both the basis for a new trial and as a Brady violation. To the extent he raises this as new evidence warranting a new trial, he has not shown that the information was unavailable. The government disclosed Arias's existence during pre-trial disclosures and Arias was listed as a potential target in the wire tap affidavits. Robles had the opportunity to cross

25

examine the DEA agents and Sanz, who mentioned Arias in his testimony.

Moreover, Robles put forth his theory that he was being mistaken for Arias, who was involved in Sanz's operation, was also known as "Willie," and whose license had been suspended. Because the jury had this information and found it unpersuasive, Robles cannot show that the outcome would have been different. Thus, his claim for a new trial on this ground fails.

To the extent that Robles raises a <u>Brady</u> issue, there is no evidence that the government suppressed the information on Arias. In any event, as discussed above, Robles cannot show that the outcome would have been different. Accordingly, the district court properly denied the motions for a new trial.

### 3. Sentencing

We review a district court's determination as to the amount of drugs for clear error. <u>United States v. Simpson</u>, 228 F.3d 1294, 1298 (11th Cir. 2000). When a conviction stems from a conspiracy charge, the defendant is responsible for the amount of drugs in all reasonably foreseeable acts done in furtherance of the conspiracy. U.S.S.G. § 1B1.3(a)(2).

In determining the appropriate drug quantity, the district court must make proper findings of fact, namely, "individualized findings concerning the scope of criminal activity undertaken by a particular defendant" and findings concerning the

specific quantities attributable to that defendant. United States v. Ismond, 993 F.2d 1498, 1499 (11th Cir. 1993). In the event that the district court does not make proper findings of fact, the sentence nevertheless may be upheld if the record supports the amount of drugs attributed to the defendant. Id. The government must prove this amount by a preponderance of the evidence. Id. This court has held that "the preponderance standard is not toothless" and that it "does not grant district courts a license to sentence a defendant in the absence of sufficient evidence." United States v. Lawrence, 47 F.3d 1559, 1566-1567 (11th Cir. 1995). Rather, the burden requires "reliable and specific evidence" of the drug amounts attributable to the defendant. Id.

Here, the district court failed to make appropriate findings of fact. The court merely adopted the jury's findings without explaining the scope of Robles's activity or the foreseeable amount of drugs. Moreover, a review of the evidence at trial does not establish that Robles was involved in any part of Sanz's drug scheme aside from the September 30 transaction, where he observed a single brick of cocaine. The government has not offered sufficient evidence to show that Robles's involvement exceeded a single 200 grams transaction. There was no testimony to establish that a CD, which was code for cocaine, was a specific quantity of drugs, and no evidence that Robles was involved with the 800 grams of cocaine Sanz and

27

Isaacs were trying to sell. Accordingly, we vacate Robles's sentence and remand for resentencing.

C. Rodriguez

1. Motion for Continuance

We review the denial of a motion for a continuance for abuse of discretion. United States v. Baker, 432 F.3d 1189, 1248 (11th Cir. 2005).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "[A]n essential part of that right is the accused's ability to select the counsel of his choice." United States v. Ross, 33 F.3d 1507, 1522 (11th Cir. 1994) (citation omitted). "Thus, a criminal defendant has a presumptive right to counsel of choice." Id. Nevertheless, a defendant's right to the counsel of his choice is not absolute. Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) (noting some of the circumstances in which the right to counsel of choice is "circumscribed"); see also Ross, 33 F.3d at 1523.

In other words, the Sixth Amendment right to counsel of choice is not inexorable. United States v. Gonzalez-Lopez,126 S.Ct. 2557, 2565-66, 165 L.Ed.2d 409 (2006); Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983). Thus, a denial of a continuance request will not always

amount to a Sixth Amendment violation of a paying defendant's choice of counsel. Baker, 432 F.3d at 1248 (citing Ungar v. Sarafite, 376 U.S. 575, 589-91, 84 S.Ct. 841, 849-50, 11 L.Ed.2d 921 (1964)). A court may limit a defendant's right to counsel of his choice for many reasons including "the demands of its calendar," or "fairness." Gonzalez-Lopez, 126 S.Ct. at 2565-66.

The district court, in exercising its discretion, must balance a defendant's right to adequate representation against the overall interest in the efficient administration of justice. Baker, 432 F.3d at 1248. "Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to assistance of counsel." Morris, 461 U.S. at 11-12. (internal citations and quotation marks excluded). An appellate court, when reviewing whether the denial of a continuance violated a defendant's "fair or reasonable opportunity" to choose counsel, should consider the following factors: (1) the length of the delay; (2) whether the counsel who becomes unavailable for trial has associates prepared to try the case; (3) whether other continuances have been requested and granted; (4) the inconvenience to all involved in the trial; (5) whether the requested continuance is for a legitimate reason; and (6) any unique factors. Baker, 432 F.3d at 1248 (internal quotations

29

omitted) (citing United States v. Bowe, 221 F.3d 1183, 1190 (11th Cir. 2000)).

Here, the court already had granted three previous continuances when Rodriguez sought another continuance eleven days before the trial was to begin. The government and the other defendants were ready to proceed to trial. The court instructed that the substitution of counsel was acceptable as long as new counsel adhered to the court's trial schedule. We find no abuse of discretion.

### 2. Sufficiency of the Evidence

Rodriguez asserts that his involvement was consistent with that of a buyer-seller relationship.

Although existence of a simple buyer-seller relationship alone does not furnish the requisite evidence of conspiratorial agreement, where the buyer knowingly assumes a role instrumental to the success of the conspiracy, a jury may properly infer that he is a member of it. United States v. Bascaro, 742 F.2d 1335, 1359 (11th Cir. 1984); see also United States v. Mercer,165 F.3d 1331, 1335-36 (11th Cir. 1999) (concluding that a buyer-seller relationship by itself was insufficient to infer the existence of a conspiracy, but acknowledging that a pattern of repeated transactions and fronting drugs would be sufficient).

Here, viewing the evidence in the light most favorable to the government, the evidence was sufficient to convict Rodriguez. The government presented

30

several intercepted phone calls in October and November which Rodriguez, Sanz, and Gonzalez-Perez used code words for drug transactions. These conversations also clarified that Rodriguez had been involved in other transactions with Sanz and Gonzalez-Perez prior to these intercepted calls. Additionally, Rodriguez warned Sanz that he was being followed as Sanz was on his way to meet Rodriguez. And Rodriguez's cell mate testified that Rodriguez admitted his involvement and named the other participants. Because witness credibility is the sole province of the jury, Parrado, 911 F.2d at 1571, we conclude this evidence was sufficient for the jury to find that Rodriguez conspired to possess cocaine with the intent to distribute it.

### III.

For the foregoing reasons, we **AFFIRM** the convictions of all defendants, we **AFFIRM** the sentences of Sanz and Rodriguez, and we **VACATE** and **REMAND** Robles's sentence for further proceedings consistent with this opinion.