*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY DARNELLE TAIT,

        Defendant-Appellant.

UNPUBLISHED
April 07, 2025
2:53 PM

No. 365739
Oakland Circuit Court
LC No. 2022-280881-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY DARNELLE TAIT,

        Defendant-Appellant.

No. 365740
Oakland Circuit Court
LC No. 2022-279936-FC

Before: GARRETT, P.J., and K. F. KELLY and SWARTZLE, JJ.

PER CURIAM.

In these consolidated appeals,[1] in Docket No. 365739, defendant appeals by right his jury-trial convictions of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(c), and one count of first-degree home invasion, MCL 750.110(a)(2). In Docket No. 365740, defendant appeals by right his jury-trial convictions of one count each of CSC-I and first-degree home invasion. The trial court sentenced defendant, as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of 37 to 80 years' imprisonment for each CSC-I

---

[1] *People v Tait*, unpublished order of the Court of Appeals, entered April 26, 2023 (Docket Nos. 365739 and 365740).

conviction and 24 to 50 years' imprisonment for each first-degree home invasion conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

These cases arise from defendant's sexual assaults of two women, DD and LM, in separate incidents in their homes in Pontiac, Michigan, in December 2021. At trial, DD testified that she was sleeping in her home one night in early December 2021, when she awoke to defendant on top of her holding her down with his hand over her mouth. Defendant sexually assaulted DD and, after the assault, the two spoke to each other. As defendant left the house, he left behind a sock which DD placed outside her front door. While DD did not initially report the sexual assault to the police, her home was broken into two days later, at which time she shared the information about the sexual assault with the police and the sock was collected from her home.

LM testified at trial that in early December 2021, defendant appeared on her back deck, told her that he was homeless, and asked if she would let him in. LM refused and, after speaking with the man for some time with the porch light on, she was able to get a good look at the man's face before she asked him to leave. A few days later, LM was sleeping on her couch in the middle of the night when she awoke with defendant on top of her, slapping her with a leather glove to wake her. Defendant told LM he was going to sexually assault her and not to scream or make any noise or he would hurt her or kill her. Defendant sexually assaulted LM over the course of almost five hours that he was in her home. LM was able to get a good look at the attacker's face and discern that he was the same individual who had appeared on her deck a few days before. At trial, LM clearly identified defendant as the man who had sexually assaulted her. When LM reported the sexual assault to the police, she was shown a photographic lineup and she identified defendant as her assailant.

Defendant was convicted by a jury and sentenced as previously noted. This appeal followed.

## II. ANONYMOUS JURY

Defendant first argues that his due-process rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated by the trial court's use of an anonymous jury. We disagree.

## A. STANDARDS OF REVIEW

A trial court's decision to refer to the jury panel by numbers, rather than by name, is a decision regarding the conduct of voir dire, which this Court reviews for an abuse of discretion. *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). The trial court abuses its discretion when its decision falls outside a range of reasonable and principled outcomes. *People v Danto*, 294 Mich App 596, 599; 822 NW2d 600 (2011). However, defendant did not raise his constitutional claim in the trial court, and unpreserved constitutional claims are reviewed for plain error. *People v Olney* (*On Remand*), 333 Mich App 575, 581 n 2; 963 NW2d 383 (2020). For a defendant to avoid forfeiture under the plain error rule, three requirements must first be satisfied:

1) Error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (citations, quotation marks, and brackets omitted).]

## B. ANALYSIS

The anonymous jury has its origin in the federal court system, "primarily as a protection against dangerous individuals." *Williams*, 241 Mich App at 522. It was not until the 1990s that the state courts began to use the procedure, recognizing that it may promote the safety of the jury venire, but at a potential cost to the defendant, i.e., the defendant's ability to conduct a meaningful questioning of the jury venire and the defendant's constitutional right to be presumed innocent. *Id*. at 522-523. Therefore, for a defendant to successfully prevail in his claim that the use of an anonymous jury in criminal proceedings violated his right to due process, the record must indicate that the parties had information withheld from them which prevented meaningful voir dire or that the defendant's presumption of innocence was compromised. *Id*. at 523

In *Williams*, this Court was not persuaded that an anonymous jury was even impaneled because the meaning of the term "in the strict sense" meant that specific biographical information about the jury venire was withheld from the parties. *Id*. However, in *Williams*, the jurors were simply referred to during trial by their juror numbers as opposed to their names, and the record did not otherwise support a conclusion that any biographical information was withheld from the parties. *Id*. As this Court explained, "At most, the names of the jurors were replaced by numbers." *Id*. In *Williams*, the defendant admitted on the record that he had access to the biographical information of the jurors, as contained in juror questionnaires, and that both parties participated during the voir dire and information was not withheld from either party. *Id*. at 523-524. Simply put, "[t]here [was] nothing to indicate that [the] defendant's ability to effectively examine the venire was compromised in any way." *Id*. at 524. This Court reasoned:

In addition, there is nothing in the record to indicate that the use of numbers undermined the presumption of innocence. There is no suggestion that jurors understood the use of numbers rather than names to be anything out of the ordinary. Thus, there was no suggestion that defendant's trial was being handled in a special way, with the resulting implication that he was generally dangerous or guilty as charged. Other state appellate courts have declined to review claims of prejudice in the withholding of jurors' names in the absence of any evidence in the record of prejudice. [*Id*.]

Thus, the Court did not discern any reason to presume prejudice arising from the trial court's actions but cautioned trial courts regarding "the potential for prejudice" that could arise from the

use of anonymous juries, stating that the procedure should be used only under circumstances in which the safety of jurors or the potential of harassment was implicated. *Id*. at 525. Even then, "appropriate safeguards should be carefully followed to assure a fair trial." *Id*.

Similarly, in *People v Hanks*, 276 Mich App 91, 94; 740 NW2d 530 (2007), this Court "strongly urge[d]" trial courts to advise the jury venire that any use of numbers instead of the names of the jurors was simply for logistical purposes and that the jury ought not to consider this action in any way negatively against the defendant. In *Hanks*, the juror questionnaires included biographical information were provided to the parties, allowing the parties to conduct an extensive voir dire. *Id*. In addition, the record did not yield any indication that the jurors thought that the trial court's use of numbers was significant. *Id*. Given that the trial court's use of the anonymous jury was limited to the literal sense, the dangers of the anonymous jury were not present and the defendant's right to engage in a meaningful voir dire and his right to the presumption of innocence were not undermined. *Id*.

Defendant asks this Court to require the trial court to conclude that the requirements of a two-prong analysis from *United States v Thomas*, 757 F2d 1359 (CA 2, 1985), are satisfied before using an anonymous jury. Defendant also urges this Court to adopt the list of factors from *United States v Ross*, 33 F3d 1507 (CA 11, 1994), in determining whether the jury requires protection before impaneling an anonymous jury. To the extent defendant is requesting that this Court adopt the two-prong analysis from *Thomas* and that the *Ross* factors be considered in determining whether a jury needs protection, we decline his invitation. First, we note that *Williams* and *Hanks* are published and binding on this Court, while lower federal court decisions are not. *People v Fomby*, 300 Mich App 46, 50 n 1; 831 NW2d 887 (2013). And second, we note that *Thomas* and *Ross* directly conflict with this Court's binding jurisprudence concerning the use of anonymous juries. Accordingly, we will continue to follow the principles of Michigan law that have been clearly articulated in published and binding authority.

Defendant has not made a meaningful argument that his due-process right to the presumption of innocence was undermined, aside from the general assertion that the trial court used numbers, rather than names, to identify the jurors during jury selection and throughout trial. The trial court here did not state that it was its practice to use numbers to identify jurors, but as previously stated, our review of the record did not otherwise indicate that defendant's trial was being handled in a special way or that there was any implication that defendant was dangerous or guilty as charged. *Id*. Put simply, there was no indication from the record of any prejudice to defendant and, without such a showing, we are unable to conclude that the trial court's reference to the jurors by number undermined defendant's presumption of innocence.

III. PROPORTIONALITY OF DEFENDANT'S MINIMUM SENTENCES FOR CSC-1

Defendant also argues that his 37-year minimum sentences for the CSC-I convictions should be vacated and the case remanded for resentencing because his sentences did not satisfy the principle of proportionality. We disagree.

A. STANDARDS OF REVIEW

All sentences are reviewed for reasonableness, which requires this Court to determine if the sentence is proportionate to the seriousness of the matter. *People v Posey*, 512 Mich 317, 352; 1 NW3d 101 (2023) (opinion by BOLDEN, J.).

> [T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the "principle of proportionality" set forth in *People v Milbourn*, 435 Mich 630, 636, 461 NW2d 1 (1990), "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." [*People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017).]

Sentencing decisions are to be reviewed for an abuse of discretion to determine if they violate the principle of proportionality. *Posey*, 512 Mich at 325 (opinion by BOLDEN, J.). If the trial court's decision falls outside the range of reasonable and principled outcomes, it has abused its discretion. *People v Foster*, 319 Mich App 365, 375; 901 NW2d 127 (2017). This standard of review recognizes that there may be more than one principled outcome and the trial court may not deviate from that principled range of outcomes. *People v Boykin*, 510 Mich 171, 182; 987 NW2d 58 (2022).

## B. ANALYSIS

In *Posey*, 512 Mich at 347 (opinion by BOLDEN, J.), the Michigan Supreme Court recognized that following its decision in *People v Lockridge*, 498 Mich 358, 391; 870 NW2d 502 (2015), Michigan's sentencing guidelines were no longer mandatory, but that they nonetheless remained a highly relevant consideration in the trial court's exercise of sentencing discretion. In *Lockridge*, 498 Mich at 392, the Court also instructed that sentences that were imposed outside of the guidelines' range would be reviewed for "reasonableness." Post-*Lockridge*, however, this Court held that MCL 769.34(10) remained valid and that sentences within the guidelines were automatically affirmed unless there was an error in scoring or the trial court had relied on inaccurate information. *People v Schrauben*, 314 Mich App 181, 196 n 1; 886 NW2d 173 (2016), overruled in part by *People v Posey*, 512 Mich 317 (2023). However, in *Posey*, 512 Mich at 352 (opinion by BOLDEN, J.), the Supreme Court held that in accordance with both *Lockridge* and *Steanhouse*, appellate courts were to review all sentences imposed for reasonableness, which required the reviewing court to evaluate whether the sentence was proportionate to the seriousness of the matter. A sentence that is imposed within the guidelines' recommended range is presumed to satisfy the principle of proportionality unless the defendant is able to overcome that presumption. *Id*. at 357.

On appeal, defendant contends that his minimum sentences do not satisfy the principle of proportionality because they are "above the average and [do] not allow for the same realistic chance at parole of those sentenced to parolable life for murder convictions." Defendant, however, has not offered any evidence to substantiate his allegation that his sentences are above the average and that they will not allow him a realistic chance at parole. Under settled Michigan precedent, because defendant's minimum sentences fall within the advisory guidelines' range, they are presumed to be proportionate, and defendant bears the onus of demonstrating otherwise. *Posey*, 512 Mich at 357 (opinion by BOLDEN, J.). Defendant's unsubstantiated allegations simply do not rebut the presumption of proportionality.

Defendant, citing *People v Coles*, 417 Mich 523; 339 NW2d 440 (1983), overruled on other grounds by *Milbourn*, 435 Mich at 635, asserts that his "de facto" sentence of life imprisonment does not comport with the goals of sentencing. As a matter of factual accuracy, defendant was not given a life sentence; his minimum sentences for the CSC-I convictions are each a term of 37 years, which fell within the advisory guidelines' range. Moreover, the trial court did not abuse its discretion in imposing 37-year minimum sentences for defendant's multiple convictions of CSC-I. The trial court's ruling indicated that in imposing defendant's minimum sentences, it considered defendant's parole violations, the detailed information in his presentence investigation report (PSIR), the nature of the offenses as he broke into the homes of strangers to rape them, and the jury's strength in the conviction of its verdict. The detailed information in the PSIR specifically showed that defendant had an inability to conform his behavior to the requirements of the law and that he continued to flout the requirements of his parole supervision, going so far as to forcibly remove his GPS tether before he committed the instant offenses.

Defendant also asserts that in rendering his minimum sentences, the trial court impermissibly considered his prior criminal history and the psychological harm that he inflicted on DD and LM, because these factors were already accounted for in the guidelines. However, defendant's argument is factually incorrect, because the trial court *did not* emphasize defendant's prior criminal history as a factor in determining his minimum sentences. Indeed, when the trial court read the fourth-offense habitual offender notice, it clearly acknowledged that the four prior offenses had been accounted for in the advisory sentencing guidelines. Instead, it focused on his history of incurring misconduct violations while under parole supervision. The record also reflects that defendant had incurred misconduct violations while incarcerated, although the trial court did not focus on these misconduct citations in its reasoning. Further, the trial court *did not* consider the psychological harm that defendant inflicted on both LM and DD in imposing defendant's minimum sentences, but merely commented on LM's strength of character in appearing at trial to testify and at sentencing to give her victim-impact statement. The trial court also commented on how DD was struggling so much emotionally that she could not attend the sentencing but that she had the strength of character to testify at trial.

Defendant also complains that the trial court factored into his sentence the failure of the Michigan Department of Corrections (MDOC) in supervising him while on parole. However, the record does not support defendant's assertion. While the trial court expressed its strong dissatisfaction with how the MDOC handled defendant's parole supervision, the record does not support a conclusion that this was a factor that the trial court used in determining defendant's minimum sentences. Instead, the trial court specifically stated that it "was not laying blame at the parole system," but it believed that how defendant's parole was handled was a "shining example" of the trial court's perception that flaws remain in the corrections system. Accordingly, while the trial court's comments reflected its concern with defendant's case from a parole supervision perspective, its comments in no way indicated that the MDOC's handling of this case factored into its determination of defendant's minimum sentences.

Defendant's arguments also overlook that the pivotal question for a within-guidelines sentence is whether the sentence was proportionate to the seriousness of the matter. *Posey*, 512 Mich at 352 (opinion by BOLDEN, J.). Defendant's sentences are proportionate to the seriousness of the crimes of which he was convicted, particularly given defendant's continued unwillingness to obey the law and to comply with the requirements of the parole supervision system after multiple

prior interactions with the justice system. See *Milbourn*, 435 Mich at 668 (recognizing that Michigan's Legislature has decided to impose the harshest punishment against those who have shown an unwillingness to obey the law after prior interactions with the legal system).

As the Michigan Supreme Court has observed, the foundation of Michigan's criminal justice system is that the more severe and shocking the crime, and the more recidivist the offender, the harsher the punishment that will be imposed. *Id*. Defendant committed these two home invasions and sexual assaults while on parole for the violent sexual assault of a 67-year old woman in 2004, and the MDOC was not able to adequately supervise defendant after he removed his own GPS tether. Defendant's actions in sexually assaulting both DD and LM were premeditated, deliberate, and violent. The trial court correctly evaluated the goals of sentencing in rendering its decision. Specifically, the trial court noted that defendant had a nearly impossible chance of ever being rehabilitated; he was an ongoing and highly dangerous threat to society, in particular to women; and that his violent behavior therefore warranted harsh punishment. *Boykin*, 510 Mich at 183. Accordingly, because the trial court's sentence satisfied the principle of proportionality, it was reasonable and did not amount to an abuse of discretion.

## IV. STANDARD 4 BRIEF

Defendant also raises several claims of error in a Standard 4 brief he has filed on appeal, all of which we address in turn.

## A. ADMISSION OF EVIDENCE

On appeal, defendant contends that DD tampered with evidence when she handled the sock that she found in her home shortly after she was sexually assaulted. Defendant also contends that the trial court erred in admitting the evidence because law enforcement did not follow the chain of custody. We disagree.

To preserve a claim of error regarding the admission of evidence at trial, defendant was required to raise an objection in the trial court and specify the same ground on appeal that was asserted at trial. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). At trial, defense counsel did not object to the admission of the sock found in DD's home or the report of Danielle Hankinson, a forensic analysis with the Oakland County Sheriff's Department, which addressed the results of her DNA analysis on the sock. Accordingly, the issues defendant raises regarding the integrity of the evidence were not preserved for this Court's review. *Id*.

Generally, this Court will review the trial court's decision on an evidentiary issue for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019). However, unpreserved evidentiary issues are reviewed for plain error affecting substantial rights. *Id*. at 252-253. To the extent that defendant raises related unpreserved allegations of prosecutorial

misconduct,[2] this Court's review is also for plain error. *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011).

At issue here is MCL 750.483a(5)(a), which prohibits a person from tampering with evidence. MCL 750.483a "broadly criminalizes attempts to interfere with the reporting, investigating, or prosecution of crimes." *People v Holley*, 480 Mich 222, 226; 747 NW2d 856 (2008). MCL 750.483a provides, in pertinent part:

> (5) A person shall not do any of the following:

> (a) Knowingly and intentionally remove, alter, conceal, destroy, or otherwise tamper with evidence to be offered in a present or future official proceeding.

In *People v Walker*, 330 Mich App 378, 387-388; 948 NW2d 122 (2019), this Court accepted for the purposes of that appeal, but did not expressly decide, that the word "knowingly" in MCL 750.483a(5)(a) included knowledge of official proceedings, including those that had not yet begun. This Court also recognized that a person's state of mind can be established with minimal circumstantial evidence. *Id*. at 388.

Defendant claims that he was denied due process as a result of the admission of the sock evidence. Both the United States Constitution and the Michigan Constitution protect a defendant's right to receive due process of law. *People v Horton*, 341 Mich App 397, 989 NW2d 885 (2022). Underlying the guarantee of due process is that each defendant has the right to a fair trial, and fundamental to the right to a fair trial is the defendant's right to be presumed innocent. *Id*. at 401. Key to the presumption of innocence is that guilt is to be determined solely on the basis of evidence introduced at trial. *Id*.

DD testified that she observed the sock shortly after the sexual assault, and she placed it outside of her front door because of her fear that her assailant may return to secure the sock. DD did not tell anyone about the sexual assault for two days. When the police came to DD's home two days later to investigate a separate break-in, DD informed them about the sexual assault and of the presence of the sock that defendant left behind, which was in the same location that she had placed it two days before. Therefore, contrary to defendant's bare allegations in his Standard 4 brief, the evidence does not support a conclusion that in placing the sock outside of her front door, DD knowingly and intentionally tampered with evidence. MCL 750.483a(5). Instead, the evidence reflects that DD, in an effort to protect herself from another sexual assault, placed the sock outside of her home in case defendant returned to secure his sock. The admission of the sock did not undermine the presumption of innocence afforded to defendant, there was no basis to

---

[2] While prosecutorial misconduct has become "a term of art" in criminal appeals, the term "misconduct" is more appropriately applied in the context of extreme instances in which a prosecutor's conduct contravenes the rules of professional conduct or rises to the level of illegal conduct. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015).

exclude the sock from evidence, and the record did not indicate any risk that defendant's guilt was determined on the basis of improperly admitted evidence.

## B. PROSECUTORIAL MISCONDUCT

In another unpreserved claim, defendant also argues that the prosecution engaged in misconduct by presenting contaminated evidence to the jury. We disagree.

In determining whether the prosecution engaged in misconduct, the pivotal query is whether defendant was denied a fair and impartial trial. *People v Caddell*, 332 Mich App 27, 71; 95 NW2d 488 (2020). Defendant argues that the prosecution committed misconduct by admitting into evidence the sock found at DD's home because it was not established that the chain of custody was followed in handling the evidence. However, the evidence at trial, both from the testimony of Deputy Ryan Boucher and Hankinson, established that the chain of custody was followed with respect to the sock, and defendant did not introduce any evidence to the contrary. Likewise, defense counsel's extensive cross-examination of both Hankinson and Deputy Boucher did not undermine their testimony regarding the chain of custody for the sock found in DD's home. Moreover, in *People v White*, 208 Mich App 126, 131; 527 NW2d 34 (1994), this Court held that the admission of real evidence did not require a perfect chain of custody, and any deficiency in the chain of custody will go to the weight of the evidence, rather than its admissibility, "once the proffered evidence is shown to a reasonable degree of certainty to be what its proponent claims." Accordingly, defendant has not established plain error with regard to his claim that the prosecution engaged in misconduct in admitting the sock into evidence.

Defendant also claims that the sock containing the DNA profile was impermissibly seized from DD's home, and that the warrant that the police relied on to seize the sock did not comply with several Michigan statutes. For example, defendant appears to challenge the affidavit underlying the search warrant. Defendant's argument is factually deficient because there is no indication in the record that DD's home was searched pursuant to a search warrant. Rather, the police had permission to be in DD's home and collected the sock with her consent. Likewise, defendant's claim that the prosecution engaged in misconduct in admitting the sock into evidence when it was obtained as a result of a faulty search warrant is also without merit given the absence of a search warrant.

## C. IDENTIFICATION OF DEFENDANT AS ELEMENT OF OFFENSES AND CONSTITUTIONALITY OF PRETRIAL IDENTIFICATION

Defendant next contends that the prosecution did not prove beyond a reasonable doubt that he was the individual that sexually assaulted DD. Defendant also claims that the photo lineup that was shown to LM and admitted as an exhibit at trial was unduly suggestive and therefore constitutionally infirm. We disagree.

In the trial court, defendant did not challenge LM's identification of him in the photographic lineup as violating his right to due process. Accordingly, this issue was not preserved for this Court's review. *Posey*, 512 Mich at 331 (opinion by BOLDEN, J.). However, with regard to defendant's claim that the prosecution did not present sufficient evidence of identification with respect to the offense against DD, and force or coercion to support his convictions of CSC-I with

regard to DD and LM, defendant was not required to "take any special steps to preserve a challenge to the sufficiency of the evidence." *People v Cain*, 238 Mich App 95, 116-117; 605 NW2d 28 (1999). Therefore, this issue is preserved for this Court's review. *Id*.

> [T]his Court reviews de novo a defendant's challenge to the sufficiency of the evidence to support his or her conviction. In examining the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. [*People v Speed*, 331 Mich App 328, 331; 952 NW2d 550 (2020) (quotation marks and citations omitted).]

Because defendant did not object to the admission of the photo lineup at trial, this Court reviews defendant's claim of error for plain error affecting his substantial rights. *Posey*, 512 Mich at 341 (opinion by BOLDEN, J.).

For defendant to be convicted of CSC-I under MCL 750.520b(1)(c), the prosecution must have established that defendant engaged in sexual penetration with both DD and LM, "accompanied by one of seven aggravating circumstances." *People v Petrella*, 424 Mich 221, 239; 380 NW2d 11 (1985). In the present cases, the prosecution charged defendant under MCL 750.520b(1)(c), which provides, in pertinent part:

> (1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
>
> * * *
>
> (c) Sexual penetration occurs under circumstances involving the commission of any other felony.

In the present cases, the underlying felonies at issue were the commission of first-degree home invasion, MCL 750.110a(2), as defendant entered the homes of both DD and LM without consent to sexually assault them. Accordingly, while defendant claims that the prosecution did not prove the offense of CSC-I because it did not establish the element of force or coercion, the prosecution was not required to prove this element.

Defendant also claims that the prosecution did not prove beyond a reasonable doubt that he was the individual that sexually assaulted DD. The identity of the individual that committed the offense is an element that the prosecution bears the burden of establishing beyond a reasonable doubt. *People v Yost*, 278 Mich App 341, 356, 749 NW2d 753 (2008). At trial, DD testified that she was unable to identify her assailant because she did not look directly at him during the sexual assault, but at trial the sock that was found in her home was admitted into evidence, and Hankinson gave detailed evidence regarding the DNA profile that she analyzed from the sock. Specifically, Hankinson stated that she was able to create a DNA profile from the sock, it was interpreted as a single source profile originating from a single male individual, and she was able to compare it to the known sample of defendant. Hankinson also opined that on the basis of the DNA typing results it was approximately 11.6 octillion times more likely that the DNA on the sock originated from

-10-

defendant than if it had originated from an unknown, unrelated individual. Hankinson further summarized that her analysis provided very strong support that defendant was a contributor to the DNA typing results. The DNA profile evidence was therefore strong circumstantial evidence that inculpated defendant both in the first-degree home invasion of DD's home, as well as in the sexual assault. Additionally, contrary to defendant's arguments in his Standard 4 brief, circumstantial evidence and the reasonable inferences that arise from that evidence can amount to satisfactory proof of the elements of the offense. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

Turning to defendant's argument that his due-process rights were violated by the admission of the photo lineup at trial, to establish a meritorious due-process challenge under the Fourteenth Amendment, defendant must show that the photo array was "so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.). Due-process concerns will only arise if law enforcement officers employ an identification procedure that is both suggestive and unnecessary. *Perry v New Hampshire*, 565 US 228, 238; 132 S Ct 716; 181 L Ed 2d 694 (2012). If the trial court determines that the photo array was indeed unduly suggestive, then testimony concerning the pretrial identification cannot be admitted at trial. *Id*. In contrast, the same witness may still be permitted to make an in-court identification if an independent basis for an in-court identification can be demonstrated that is otherwise not tainted by the alleged unduly suggestive pretrial procedure. *Id*.

In his Standard 4 brief, defendant does not specifically explain how the photo array in this case was unduly suggestive given the circumstances surrounding the identification procedure. While defendant cites the factors from the Court's decision in *Neil v Biggers*, 409 US 188; 93 S Ct 375; 34 L Ed 2d 401 (1972), he does not articulate how these factors apply to the circumstances of the present case. Defendant generally references his height, weight, build, hair color, length and texture of his hair, presence and absence of facial hair, skin color, complexion, the shape and size of his nose, eyes, and lips in the photo array as characteristics that are so different from the other individuals in the photo array that they rendered the photo array unduly suggestive. Thus, we are not persuaded that the photo of defendant was such that LM would have selected the photo of defendant on the basis of some differentiating outward characteristic, rather than his looks. *Id*.

Moreover, even considering the factors from *Neil*, they weigh against a conclusion that misidentification occurred. For example, LM had ample opportunity to observe defendant's features because she observed him twice: when she spoke with him when he appeared on her deck on December 5, 2021, and again on December 9, 2021, the evening the sexual assault took place. LM testified that when she first heard a noise on her deck and saw a man outside she was able to see the man's face with the porch light on. LM was able to pay close attention to defendant, she described the distance between herself and the man as "very close," they talked for a few minutes, and she was able to get a good look at him with the porch light illuminating the deck before he ran away. LM said there was enough light in her living room to see her assailant on December 9, 2021, and she knew "right away it was the same guy that was on my porch asking me to let him in so he could sleep because he was homeless." A few months after the sexual assault, it occurred to LM that her assailant had lived across the street from her approximately 20 years before. During the sexual assault on December 9, 2021, which lasted approximately 4½ hours, LM had the continued opportunity to speak with her assailant and ask him questions. It was within 10 days of the sexual assault that LM reported the sexual assault to the police, and within one to two days

after her initial report that she identified defendant from the photo array. And in the wake of the December 2021 assault, LM was able to clearly identify defendant in court in March 2023. Accordingly, defendant's contention that the photo array was unduly suggestive and therefore violated his right to due process is without merit.

Affirmed.

/s/ Kristina Robinson Garrett
/s/ Kirsten Frank Kelly
/s/ Brock A. Swartzle